**UNITED STATES of America,**
**Appellee,**

v.

**Frank KLIMEK, Defendant–Appellant.**

**Docket No. 04–2549–CR.**

United States Court of Appeals,
Second Circuit.

Argued: May 18, 2005.

Decided: June 8, 2005.

David A. Lewis, The Legal Aid Society, New York, N.Y. for Defendant–Appellant.

Jonathan B. New, Assistant United States Attorney (Peter G. Neiman, Assistant United States Attorney, of counsel; David N. Kelley, United States Attorney for the Southern District of New York, on the brief), United States Attorney's Office for the Southern District of New York, New York, N.Y. for Appellee.

Before: MESKILL, NEWMAN, and CABRANES, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge.

Defendant Frank Klimek appeals from a judgment entered on·April 9, 2004 in the United States District Court for the Southern District of New York (Colleen McMahon, *Judge*), following revocation of his supervised release. After conducting an evidentiary hearing, the District Court found that defendant violated his supervised release conditions by ingesting cocaine. Defendant argues that two statutory provisions—18 U.S.C. §§ 3583(d) and 3608—strip the District Court of the authority to draw this conclusion when a confirmatory drug test falls below the threshold for a "positive" test, as that threshold is defined in the contract between the testing laboratory and the Administrative Office of the United States Courts ("AO"). We disagree and therefore affirm the judgment of the District Court revoking defendant's supervised release.

**BACKGROUND**

On November 3, 2000, defendant pleaded guilty in the United States District Court for the Northern District of New York to one count of conspiracy to possess, with intent to distribute, cocaine and cocaine base, in violation of 21 U.S.C. § 846. Defendant was sentenced to twenty four months' imprisonment followed by three years of supervised release.

Defendant's supervised release term commenced on June 18, 2002. Due to defendant's relocation, supervision was transferred to the United States District Court for the Southern District of New York ("District Court" or "Court"). On three occasions between December 2002 and February 2003, defendant tested positive for drugs. The District Court held a violation hearing on April 11, 2003, and ordered defendant to enroll in a drug program.

In November and December 2003, two separate urine samples submitted by defendant to the United States Probation Office ("USPO") tested positive for lysergic acid diethylamide ("LSD"). Although retests, also known as "confirmation" tests, failed to confirm the presence of LSD in defendant's urine, he admitted using LSD to his probation officer and pleaded guilty to violating his supervised release conditions. On January 15, 2004, the District Court modified the terms of his supervision to include sixty days of home confinement.

On January 27, 2004, before defendant began his home confinement term, another urine sample he submitted to the USPO tested positive for cocaine. The sample was then sent by the USPO to Scientific Testing Laboratories, Inc. ("STL") for a "confirmation" test using gas chromatography and mass spectrometry ("GC/MS") techniques. STL's confirmation test detected cocaine metabolite at the level of 118 nanograms per milliliter. According to STL's contract with the AO, however, a sample does not test "positive" for cocaine unless it meets or exceeds a "cutoff" level of 150 nanograms per milliliter. Notwithstanding defendant's contention that the confirmatory test conclusively determined that he had not violated the terms of his supervised release, the District Court scheduled a hearing to investigate what it

described as "the biodegradability of cocaine"[1] and the possibility that defendant may have attempted to flush cocaine out of his system.

At the hearing, the Court heard testimony from Lisa Tamai, STL's laboratory director. Ms. Tamai explained the GC/MS technique used in STL's confirmation drug tests, which can identify and quantify cocaine metabolite concentrations as low as 30 nanograms per milliliter. According to Ms. Tamai, the cutoff level of 150 nanograms per milliliter set forth in the AO's contract with STL has no particular scientific significance and was established "[b]ack when President Reagan set into place the procedures for federal workplace drug testing," based on testing methodologies available at that time. Ms. Tamai also testified that dilution of the urine sample can adversely affect the accuracy of the GC/MS technique. A urine sample may become "dilute" if the person providing the sample first consumes massive fluid volumes or if the sample is mixed with other fluids at the time of collection.

Ms. Tamai also testified that the concentration of cocaine metabolite found in defendant's urine sample could only be explained by his use of cocaine. Moreover, defendant's sample was "dilute"[2] and, had it been "normalized"[3] for dilution, cocaine metabolite would be present at a level of 406 nanograms per milliliter. Defendant presented no witnesses and offered no additional documentary evidence at the hearing.

In a decision dated March 2, 2004, the District Court concluded that a confirmatory test result that falls below the cutoff level specified in the testing laboratory's contract with the AO does not preclude a court from finding that a defendant had indeed ingested a controlled substance. The Court credited Ms. Tamai's testimony and found, by a preponderance of the evidence, that defendant had ingested cocaine in violation of his supervised release conditions. In reaching its conclusion, the Court relied not only on the cocaine metabolite concentration in defendant's urine sample, but also on other "pertinent" evidence, including the proven dilution of the sample and defendant's undisputed history of drug use during his supervised release term. In a judgment entered on April 9, 2004, the District Court sentenced defendant principally to eighteen months' imprisonment followed by fifteen months of supervised release.

Defendant now appeals from that judgment on the ground that the Court lacked

1. By "biodegradability," the Court apparently meant "that there would be some breakdown in the composition of the specimen and possibly some diminution in the quantity of drugs over the course of days." This "biodegradability" argument was not ultimately pursued by the Government.

2. The conclusion that defendant's urine sample was "dilute" relied on the finding that it had a "specific gravity" statistic of 1.003. Ms. Tamai testified that samples with "specific gravity" statistics of 1.000 and 1.001 are considered invalid, while those with "specific gravity" statistics of 1.002 and 1.003 are considered valid but "dilute." STL conducted a second test for dilution, which analyzed the concentration of creatinine in defendant's sample. Creatinine is "a white crystalline strongly basic compound $C_4H_7N_3O$ formed from creatine by dehydration and found especially in muscle, blood, and urine." *Merriam–Webster's Third New International Dictionary Unabridged* 532 (1976). Samples with creatinine concentrations below 15 milligrams per deciliter are considered "dilute." Defendant's sample tested at 29.6 milligrams per deciliter, a result that is within acceptable range but well below the average creatinine concentration of 100 milligrams per deciliter.

3. Ms. Tamai defined "normalization" as "a procedure ... performed to correct for the concentration of urine being either too dilute or too concentrated."

statutory authority to revoke his term of supervised release.

## DISCUSSION

 Whether in the circumstances presented the District Court was precluded by statute from revoking defendant's supervised release is a "pure question[ ] of law" subject to *de novo* review. *United States v. Barresi*, 361 F.3d 666, 671 (2d Cir.2004).

 A district court may "revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release, . . . if the court . . . finds by a preponderance of the evidence that the defendant violated a condition of supervised release." 18 U.S.C. § 3583(e)(3). It is undisputed that ingesting a controlled substance constituted a violation of defendant's supervised release conditions. Defendant argues, however, that the District Court was *per se* precluded from finding that defendant ingested cocaine when the so-called confirmation test fell below the cutoff level specified in the contract between the testing laboratory and the AO. We disagree and hold that the totality of the evidence before the District Court amply supported the conclusion that defendant violated the conditions of his supervised release.

Defendant's argument rests entirely on two statutory provisions. First, defendant relies on 18 U.S.C. § 3583(d), which governs, *inter alia*, the drug testing of persons under supervised release. In relevant part, Section 3583(d) states:

> The results of a drug test . . . shall be subject to confirmation only if the results are positive, the defendant is subject to possible imprisonment for such failure, and either the defendant denies

the accuracy of such test or there is some other reason to question the results of the test. A drug test confirmation shall be a urine drug test confirmed using gas chromatography/mass spectrometry techniques or such test as the Director of the Administrative Office of the United States Courts after consultation with the Secretary of Health and Human Services may determine to be of equivalent accuracy.

The plain language of this provision specifies the technique with which results of positive drug tests should be "confirmed"—precisely the technique utilized by STL in analyzing defendant's sample. Nothing in Section 3583(d) precludes the District Court from considering the totality of the evidence before it—including the dilution of defendant's urine sample—in determining whether "a preponderance of the evidence," 18 U.S.C. § 3583(e), indicates that defendant ingested drugs.

Defendant's reliance on 18 U.S.C. § 3608 is similarly misplaced. That provision states, in relevant part:

> The Director of the Administrative Office of the United States Courts, in consultation with the Attorney General and the Secretary of Health and Human Services, shall, subject to the availability of appropriations, establish a program of drug testing of Federal offenders on post-conviction release. The program shall include such standards and guidelines as the Director may determine necessary to ensure the reliability and accuracy of the drug testing programs.

Defendant asserts that any confirmatory test result below the cutoff level of cocaine metabolite specified in the contract between the AO and the STL "could not be the basis of a violation," since the cutoff level is a "standard" or "guideline" promulgated pursuant to Section 3608. Even assuming that the cutoff level specified in

the contract between the AO and STL was a "standard[ ]" or "guideline[ ]" of the sort contemplated by Section 3608—an assumption that is in tension with the uncontradicted testimony before the District Court that the cutoff level had no particular scientific significance—nothing in the language of that provision precludes a district court from considering the totality of the evidence before it when a confirmatory test result falls below this cutoff level.

We need not decide at this time whether Sections 3583(d) and 3608 preclude a district court from revoking a defendant's supervised release based *solely* on a test result that fell below the cutoff level. Here, the District Court's conclusion was supported by sufficient evidence beyond the cocaine metabolite concentration of 118 nanograms per milliliter in defendant's urine sample. Defendant had a long and uncontroverted history of supervised release violations and the USPO initially determined that his urine sample tested positive for cocaine. Even more significantly, the confirmation test performed on defendant's sample—once it was "normalized" for dilution—would have evinced a cocaine metabolite concentration of 406 nanograms per milliliter, well above the cutoff level of 150 nanograms per milliliter.

Nor can it be said that the District Court failed to take into account the relevant cutoff level. Indeed, the Court expressly found that, even assuming that failure to meet the cutoff level rendered defendant's confirmatory test results "questionable," other evidence in the record amply supported the conclusion that defendant had ingested cocaine. Nothing in the language of Sections 3583(d) and 3608 suggests that a district court that exercises its authority to revoke supervised release under Section 3583(e) may not thus rely on the totality of the evidence before it.

Accordingly, we hold that Section 3583(d) and Section 3608 did not, either individually or in combination, preclude the District Court from relying on the totality of the evidence to conclude that defendant violated his supervised release conditions by ingesting cocaine, even though the confirmation test conducted pursuant to Section 3583(d) revealed a cocaine metabolite concentration below the cutoff level specified in the contract between the testing laboratory and the AO.

## CONCLUSION

For the reasons stated above, the judgment of the District Court revoking defendant's supervised release is affirmed.