10-1642-cr (L)
USA v. Jennings

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2010

(Argued:  April 12, 2011                                    Decided:  July 22, 2011)

Docket Nos. 10-1642-cr (Lead) 10-1704-cr (Con)

_____

UNITED STATES OF AMERICA,

Appellee,

- v. -

RUSSELL JENNINGS,

Defendant-Appellant.

_____

Before:  KEARSE, MINER, and CHIN, Circuit Judges.

Consolidated appeals from two judgments entered in the United States District Court for the Northern District of New York, Thomas J. McAvoy, Judge, one convicting defendant of possessing child pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2), and the other revoking the supervised release to which defendant had been sentenced on a prior conviction for violation of § 2252A(a)(5)(B) and imposing a prison term, to be followed by a life term of supervised release, for violations of his prior supervised-release conditions.

Affirmed.

JAMES P. EGAN, Syracuse, New York (Alexander Bunin and Lisa A. Peebles, Federal Public Defenders, Melissa A. Tuohey, Assistant Federal Public Defender, Syracuse, New York, on the brief), for Defendant-Appellant.

ELIZABETH S. RIKER, Assistant United States Attorney, Syracuse, New York (Richard S. Hartunian, United States Attorney for the Northern District of New York, Miroslav S. Lovric, Assistant United States Attorney, Syracuse, New York, on the brief), for Appellee.

KEARSE, Circuit Judge:

Defendant Russell Jennings appeals from two April 2010 judgments of the United States District Court for the Northern District of New York, Thomas J. McAvoy, Judge. The first judgment, dated April 22 and entered on April 28 following a conditional plea of guilty, convicted Jennings of possessing child pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2) and sentenced him principally to 130 months' imprisonment, to be followed by a life term of supervised release ("Child Pornography Judgment II"). The second judgment, dated April 22 and entered on April 28 after Jennings had admitted violating several conditions of a supervised-release term imposed on him in a November 1, 2006 amended judgment convicting him of a prior § 2252A(a)(5)(B) offense ("Child Pornography Judgment I"), revoked his supervised release and sentenced him to 60 months' imprisonment, to be served concurrently with the prison term imposed in Child Pornography Judgment II, and to be followed by a life term of supervised release (the "Supervised-Release-Violation Judgment"). On his appeal challenging Child Pornography Judgment II, Jennings contends principally (1) that the district court should have dismissed the indictment on the ground that it was procured by his probation officer (or "P.O.") acting in excess of the P.O.'s statutory and constitutional authority; and (2) that, absent dismissal of the indictment, certain self-incriminating statements

Jennings made to his probation officer, as well as evidence seized pursuant to a search warrant obtained on the basis of those statements, should have been suppressed on the ground that his statements were protected by the Fifth Amendment privilege against self-incrimination. In challenging the Supervised-Release-Violation Judgment, Jennings argues that the severity of the penalties it imposed reflected his new conviction and that those penalties should be reduced if Child Pornography Judgment II is vacated. Finding no merit in Jennings's challenges to Child Pornography Judgment II, we affirm both judgments.

## I. BACKGROUND

Except as indicated, the following events, which are reflected principally in records of the United States Probation Office ("Probation Office" or "USPO"), in affidavits submitted by Jennings's probation officer at various stages, and in an affirmation submitted by Jennings's attorney, are not in dispute.

A. Jennings's 2006 Conviction and His Supervised Release

In the fall of 2006, following his plea of guilty in the United States District Court for the Northern District of New York before David N. Hurd, Judge, Jennings was convicted on one count of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B) and was sentenced principally to a term of 21 months' imprisonment, to be followed by a 20-year term of supervised release (the "2006 case"). The specified terms of supervised release included the conditions that Jennings "shall not commit another federal, state or local crime"; "shall answer truthfully all inquiries

by the probation officer and follow the instructions of the probation officer"; and "shall not use or possess any computer or any other device with online capabilities, at any location, except at his place of employment, unless [he] participates in the Computer Restriction and Monitoring Program." Child Pornography Judgment I, at 3-4. Paragraph 5 of the "Special Conditions of Supervision" also provided as follows:

> The defendant shall participate in a mental health program, which will include, but will not be limited to, participation in a treatment program for sexual disorders. The program shall be approved by the United States Probation Office.

> The defendant's supervised release may include examinations using polygraphs to obtain information necessary for supervision, case monitoring, and treatment. The defendant shall answer the questions posed during the polygraph examination, subject to his right to challenge in a court of law the use of such statements as violations of the defendant's Fifth Amendment rights. In this regard, the defendant shall be deemed to have not waived his Fifth Amendment rights. The results of any polygraph examinations shall be disclosed to the United States Probation Office and the Court, but shall not be further disclosed without the approval of the Court.

Id. at 4 (emphasis added) ("Special Condition ¶ 5"). In April 2008, Jennings began serving his term of supervised release and moved into his brother's home in Afton, New York.

In January 2009, the Probation Office filed a petition in the 2006 case for modifications--consented to by Jennings--of his supervised-release conditions in order to, inter alia, expand the permitted information-gathering methods beyond polygraphs. The petition, signed by Jennings's probation officer, Michael J. Pierce, stated that Jennings had "failed as deceptive" a polygraph examination in July 2008 and that Jennings had "admitted during the post test interview to sexual abuse of all four of his children (two boys and two girls) from a very early age." (USPO Request for Modifying the Conditions or Term of Supervision with Consent of the Offender ("Modification Petition") at 2.) The Modification Petition stated that although Jennings was

4

"progressing in treatment and . . . writing apology letters to his children," the probation officer "believed that the defendant requires modification of his conditions to hold him accountable, aid in the monitoring process, and enhance the protection of the community."  (Id.)

Judge McAvoy granted the petition.  The second paragraph of Special Condition ¶ 5 was renumbered 5(a), the first sentence of which, as revised, read as follows:

> Your supervised release may include examinations using a polygraph, computerized voice stress analyzer, or other similar device to obtain information necessary for supervision, case monitoring, and treatment.

Order dated January 16, 2009 ("Modification Order"), at 1 (emphasis of modification added).  The substance of Special Condition ¶ 5's passages with regard to the preservation of Fifth Amendment rights "during" any such "examination" remained the same.  Id.

In addition, whereas the original supervised-release conditions required Jennings to permit "a probation officer" to visit him in his home or elsewhere and "permit confiscation of any contraband observed in plain view of the probation officer," Child Pornography Judgment I, at 3, the Modification Petition requested, and the district court ordered, the addition of a paragraph requiring Jennings to submit "to search" by a probation officer and allowed the probation officer to enlist the aid of "other law enforcement officer[s]" for such searches, Modification Order at 2:

> 11.  You shall submit your person, and any property, house, residence, vehicle, papers, computer, other electronic communications or data storage devices or media, and effects to search at any time, with or without a warrant, by any federal probation officer, or any other law enforcement officer from whom the Probation Office has requested assistance, with reasonable suspicion concerning a violation of a condition of probation or supervised release or unlawful conduct by you.  Any items seized may be removed to the Probation Office or to the office of their designee for a more thorough examination.

Id. (emphases added).  Another new paragraph provided as follows:

> 12.  While in treatment and for the remainder of the term of supervision

following completion of treatment, <u>you shall not view, possess, own, subscribe to or purchase any material</u>, including pictures, videotapes, films, magazines, books, telephone services, electronic media, computer programs, or computer services <u>that depict sexually explicit conduct</u>, as defined in 18 U.S.C. 2256(2).

Modification Order at 2 (emphases added).

B.  <u>Jennings's 2009 Admissions While on Supervised Release</u>

On February 12, 2009, Pierce notified Jennings that he was to appear for a computer voice stress analyzer ("CVSA") examination the following week.  Around the time that Jennings received that message, he attended a group therapy session at which a speaker, discussing his own addiction to child pornography, emphasized the importance of being honest about one's behavior.  Inspired by the speaker's message, Jennings admitted during the therapy session that he had accessed pornography, including teen porn, on his brother's computer five to seven times.

The counselor leading the therapy session instructed Jennings to inform his probation officer of his actions; the counselor said that if Jennings failed to do so within a week, she would report Jennings's admission to Pierce directly--and she did contact Pierce on February 18.  In the meantime, on February 16, Jennings left a telephone message for Pierce, who returned the call the next day.  During the February 17 conversation, Jennings admitted that he had previously lied to Pierce about whether he had viewed pornography on his brother's computer.  Pierce instructed Jennings to come to the probation office to discuss the matter further.

On February 19, Jennings reported to the probation office and made additional admissions. He told Pierce that he had used his brother's computer to, <u>inter alia</u>, access and view child pornography 10-15 times since July 2008, to search the Internet for pornographic videos featuring teenagers, and to try--in vain--to access teen chat rooms.  Jennings was subjected to a CVSA

examination, which he failed by showing deceptiveness with regard to, inter alia, having sexual thoughts about his 14-year-old daughter, being alone with his daughter or another minor since his release, and attempting to have a sexual relationship with a minor since his release.

Later that day, Pierce contacted Federal Bureau of Investigation ("FBI") agent James Lyons and Assistant United States Attorney ("AUSA") Miroslav Lovric, to report and discuss Jennings's admissions. Lovric viewed Pierce's information as providing probable cause to believe that Jennings had violated § 2252A(a)(5)(B) and to believe that evidence of that crime was in the computer at Jennings's residence. Although Jennings's supervised-release conditions allowed Pierce on the basis of reasonable suspicion, with or without the assistance of other law enforcement officers, to search Jennings's residence, Lovric decided that a search warrant should be obtained because Jennings lived in his brother's residence. Accordingly, the United States Attorney's Office ("USAO") prepared a search warrant application for Jennings's brother's home; Pierce, with Lyons's assistance, drafted an affidavit dated February 19, 2009 ("First Pierce Aff."), in support of the search warrant application; Lovric reviewed the affidavit; and Pierce and Lovric then went to Judge McAvoy's chambers to apply for the warrant, which Judge McAvoy issued.

That evening, FBI and USPO officials executed the warrant and searched Jennings's brother's home. Among the items seized was Jennings's brother's computer, which was sent to the Broome County Security Division for forensic analysis. Pending the results of that analysis, Jennings remained on supervised release.

In June 2009, Pierce learned that the examination of Jennings's brother's computer had revealed, inter alia, dozens of images of child pornography. Pierce discussed the results of the forensic analysis with Lovric in early July, and when Jennings reported to the probation office for a

7

regularly scheduled visit on July 10, Pierce and another probation officer questioned him about the new evidence. Confronted with various images of child pornography that had been found on the computer, Jennings admitted, inter alia, that he had searched for, viewed, and possessed those images and that prior to February 19 he had been viewing child pornography on a daily basis.

On August 5, Lovric informed Pierce that the USAO planned to draft a criminal complaint on August 6 and have Jennings arrested on August 7. Pierce reviewed the complaint, signed it, and provided an affidavit dated August 6, 2009 ("Second Pierce Aff."), in support of the complaint. Jennings was arrested on August 7.

C. The 2009 and 2010 Court Proceedings

On August 12, 2009, the Probation Office filed a petition in Jennings's 2006 case, which had been reassigned to Judge McAvoy, seeking a warrant for Jennings's appearance in connection with that office's recommendation that Jennings's supervised release be revoked (the "Revocation Petition"). The Revocation Petition, signed by Pierce and a supervisory probation officer, stated that Jennings had violated three conditions of his supervised release: (1) that he "not commit another federal, state or local crime," (2) that he "not use or possess any computer or any other device with online capabilities, at any location, except at [his] place of employment, unless [he] participate[s] in the Computer Restriction and Monitoring Program," and (3) that, during his treatment and ensuing supervision, he "not view, possess, own, subscribe to or purchase any material, including pictures, videotapes, films, magazines, books, telephone services, electronic media, computer programs, or computer services that depict sexually explicit conduct." Judge McAvoy signed the warrant on August 17, 2009.

8

On August 18, 2009, a grand jury returned an indictment ("Indictment") charging Jennings with one count of accessing with intent to view, and possession of, child pornography from July 2008 through February 2009, in violation of 18 U.S.C. § 2252A(a)(5)(B) (see Indictment at 1), and charging that because of his 2006 conviction he was subject to an enhanced penalty pursuant to 18 U.S.C. § 2252A(b)(2) (see Indictment at 2). This case (the "2009 case") too was assigned to Judge McAvoy.

In an omnibus motion in the 2009 case, Jennings moved to dismiss the Indictment and moved to suppress his February 19 statements to Pierce, as well as the evidence seized from his brother's residence pursuant to the February 19 search warrant. The motion to dismiss challenged the propriety of Pierce's actions in contacting the FBI and the USAO and in assisting with the application for a search warrant, with the conduct of the search, and with the preparation of the criminal complaint. Jennings argued that, "[b]eing within the judiciary, probation officers have no authority to investigate new criminal conduct or initiate new criminal proceedings" (Memorandum of Law in Support of Russell Jennings's Motion to Dismiss the Indictment and Suppress Evidence ("Jennings Memorandum") at 2), and that the Indictment was the product of the "probation officer's impermissible exercise of law enforcement authority" (id. at 3) and "the direct result of" the Probation Office's "violation of the constitutionally required separation of powers" (id. at 7).

> As a member of the judiciary, Officer Pierce was limited to supervising the conditions of Jennings's release. If he thought that Jennings had committed a violation, he was free to notify the sentencing court of his findings by way of petition for revocation of supervision. However, he was not authorized to play law enforcement officer by obtaining a warrant to search and seize evidence of criminal behavior and then initiate criminal proceedings by filing a criminal complaint. Those actions were reserved to law enforcement agents within the executive.

(Id. at 6-7 (footnote omitted).)

9

Jennings argued that if the Indictment were not dismissed, at least the evidence supporting the Indictment should be suppressed. To the extent pertinent to this appeal, he argued that his self-incriminating statements to Pierce were compelled admissions, and thus were privileged under the Fifth Amendment, and that those statements should be suppressed, as should the physical evidence seized pursuant to the search warrant issued on the basis of those statements. (See id. at 10-13.)

In opposition to Jennings's motion, the government submitted an October 23, 2009 affidavit from Pierce ("Third Pierce Aff.") and an affirmation from AUSA Lovric describing their actions in consequence of Jennings's February 19, 2009 admissions as to his use of his brother's computer to search for and view child pornography. Pierce stated, inter alia, that he had, as described in Part I.B. above, contacted the FBI and Lovric and informed them of Jennings's admitted conduct, and that Pierce had put his information into affidavit form so that Lovric could obtain a search warrant for Jennings's brother's home. (See Third Pierce Aff. ¶¶ 8-9.)

Lovric, in his affirmation, stated, inter alia, that on February 19, after receiving Pierce's information as to Jennings's admissions, it was Lovric's view that there existed probable cause to believe Jennings was violating § 2252A(a)(5)(B), and the USAO immediately commenced an investigation of Jennings. (See Affirmation of Miroslav Lovric dated October 23, 2009 ("Lovric Aff."), ¶¶ 3-6.) Lovric reviewed the affidavit that Pierce had prepared in collaboration with FBI agent Lyons (i.e., the First Pierce Aff.), and Lovric had the USAO prepare the other papers he would need in order to obtain a search warrant. (See Lovric Aff. ¶¶ 2, 10-11.) Lovric stated that his decision to "[s]eek[] a search warrant was solely intended to address" the circumstance that, while Jennings was required to submit to a search without a warrant and on the basis of reasonable suspicion, Jennings resided with his brother, who was not subject to the same requirements. (Id. ¶ 9.) Lovric stated that

10

after his office had prepared the necessary papers, he took Pierce to the judge's chambers to make the search warrant application. (See id. ¶ 11.)

In a Decision and Order dated November 23, 2009, reported at 2009 WL 4110852, the district court, as set out in greater detail in Parts II.A. and II.B. below, denied both of Jennings's motions. It ruled, inter alia, that because Jennings's February 19 statements in his interview with Pierce had been made without any assertion of the Fifth Amendment privilege against self-incrimination, the statements were voluntary and Jennings had thus waived that privilege. See 2009 WL 4110852, at *4-*6.

Jennings and the government thereafter entered into a plea agreement with respect to the 2009 case, in which Jennings admitted that "[c]ommencing in July of 2008, . . . and while on federal supervised release," he had, inter alia, "[u]s[ed] a computer" to "access[], view[], and possess[] child pornography." (Plea Agreement dated December 22, 2009, ¶ 6(a).) Jennings agreed, with the consent of the government and the approval of the court, to enter a conditional plea of guilty to the offense charged in the Indictment, reserving the right to pursue on appeal "only the district court's determinations of the motions in [his] pretrial omnibus motion." (Id. ¶ 15(a).) Child Pornography Judgment II was entered on April 28, 2010, convicting Jennings of possession of child pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2), and sentencing him principally to 130 months' imprisonment, to be followed by supervised release for life.

On April 22, 2010, a hearing was held on the Revocation Petition, and Jennings admitted that he was guilty of violating the supervised-release conditions imposed in Child Pornography Judgment I as alleged in the Revocation Petition, i.e., by engaging in new criminal conduct, impermissibly using a computer, and viewing child pornography. The Supervised-Release-

11

Violation Judgment was entered on April 28, 2010, revoking Jennings's supervised release and sentencing him to 60 months' imprisonment, to be served concurrently with the prison term imposed in Child Pornography Judgment II, and to be followed by a life term of supervised release.

Jennings appealed both judgments; the appeals were consolidated by this Court.

## II. DISCUSSION

On appeal, Jennings contends principally that the district court erred in (1) denying his motion to dismiss the Indictment on the grounds that Pierce's actions in reporting to the FBI and the USAO and his involvement in the procurement of a search warrant and the filing of a criminal complaint exceeded the USPO's statutory and constitutional authority; and (2) denying his motion to suppress his February 19 self-incriminating statements to Pierce, as well as the evidence seized pursuant to the search warrant issued on the basis of those statements, on the ground that the use of those statements violated his Fifth Amendment privilege against self-incrimination. The arguments that are properly before us raise only issues of law. Reviewing the district court's legal conclusions de novo, see, e.g., United States v. Bari, 599 F.3d 176, 178 (2d Cir. 2010); United States v. Klimek, 411 F.3d 50, 53 (2d Cir. 2005), we conclude that Jennings's contentions are meritless.

### A. The Arguments for Dismissal of the Indictment

#### 1. Probation Officers' Statutory Authority

Jennings contends that although it was permissible for Pierce to inform the government of supervised-release violations and to seek assistance from law enforcement officers in executing the search of Jennings's residence, it was beyond Pierce's authority "to meet with a federal prosecutor to

discuss and plan the investigation of criminal activity," "to swear out an affidavit in support of a search warrant," "to apply for a search warrant," "to execute a search warrant," "to discuss the initiation of new criminal proceedings," "to meet with the AUSA to view evidence seized pursuant to the search warrant and discuss the collection of incriminating information from his supervisee," "to interrogate a supervisee at the direction of the government and with the aim of collecting and sharing incriminating information concerning seized evidence," "to discuss the crafting of a criminal complaint with the government," or "to swear out a criminal complaint." (Jennings brief on appeal at 40-41.) We disagree.

A person who is "placed on supervised release" following a term of imprisonment is required, "during the term imposed, [to] be supervised by a probation officer to the degree warranted by the conditions specified by the sentencing court." 18 U.S.C. § 3601. Section 3603 of Title 18 outlines the probation officer's supervisory responsibilities, which include duties to

> (1) instruct a probationer or a person on supervised release, who is under his supervision, as to the conditions specified by the sentencing court, and provide him with a written statement clearly setting forth all such conditions;

> (2) keep informed, to the degree required by the conditions specified by the sentencing court, as to the conduct and condition of a probationer or a person on supervised release, who is under his supervision, and report his conduct and condition to the sentencing court;

> (3) use all suitable methods, not inconsistent with the conditions specified by the court, to aid a probationer or a person on supervised release who is under his supervision, and to bring about improvements in his conduct and condition;

> (4) be responsible for the supervision of any probationer or a person on supervised release who is known to be within the judicial district;

> (5) keep a record of his work, . . .

13

(6) upon request of the Attorney General or his designee, assist in the supervision of and furnish information about, a person within the custody of the Attorney General while on work release, furlough, or other authorized release from his regular place of confinement, or while in prerelease custody pursuant to the provisions of section 3624(c);

(7) keep informed concerning the conduct, condition, and compliance with any condition of probation, including the payment of a fine or restitution . . . ;

(8)(A) when directed by the court, and to the degree required by the regimen of care or treatment ordered by the court as a condition of release, keep informed as to the conduct and provide supervision of a person conditionally released under the provisions of section 4243 or 4246 of this title, and report such person's conduct and condition to the court ordering release and to the Attorney General or his designee; and

(B) immediately report any violation of the conditions of release to the court and the Attorney General or his designee;

. . . and

(10) perform any other duty that the court may designate.

18 U.S.C. § 3603.

The district court, in discussing Jennings's contention that Pierce's actions exceeded his statutory authority, noted § 3603's imposition of the above duties and stated as follows:

In this case, all investigative activities by the USPO related to whether Defendant was complying with the conditions of his supervised release. This is within the statutory duties of a probation officer. Specifically, the USPO investigated whether Defendant was accessing child pornography in violation of the terms of his supervised release. That the information obtained by the USPO also supported new criminal charges does not bring the USPO's actions outside the scope of its statutory duties.

The fact that the probation officer may have sought the assistance of the FBI or the USAO or reported the conduct to the USAO does not change the result. The USAO is permitted to petition the Court for revocation of a defendant's supervised release. United States v. Bermudez-Plaza, 221 F.3d 231, 234 (1st Cir.2000) ("[R]evocation hearings are not criminal proceedings and neither the Attorney General nor any other officer is solely responsible for

14

their initiation."); see also United States v. Mejia-Sanchez, 172 F.3d 1172, 1175 (9th Cir.1999); United States v. Davis, 151 F.3d 1304, 1307-08 (10th Cir.1998). Given this authority of the USAO, it is not unreasonable to expect probation officers, as part of their official duties, to share information with the USAO to prepare revocation proceedings. . . . Whether the USAO decides to use that same information to commence criminal proceedings is within the sole discretion of the USAO. See Davis, 151 F.3d at 130[8] ("[T]he U.S. Attorney retains discretion to file new criminal charges against the defendant arising from the defendant's violation of conditions of release which was criminal in nature. . . ."). Accordingly, the Court finds that the USPO did not exceed its statutory authority.

2009 WL 4110852, at *2 (emphases added).

We agree. While supervised release is primarily intended "to assist individuals in their transition to community life," United States v. Johnson, 529 U.S. 53, 59 (2000), "[s]entencing courts, in determining the conditions of a defendant's supervised release, are required to consider, among other factors, . . . 'the need . . . to afford adequate deterrence to criminal conduct[,] [and] . . . to protect the public from further crimes of the defendant,'" id. (quoting 18 U.S.C. § 3553(a)); see 18 U.S.C. § 3583(d). Thus, the probation officer has multiple responsibilities that include "protect[ing] the public from persons whose release proves threatening to the community." United States v. Reyes, 283 F.3d 446, 455 (2d Cir.) (internal quotation marks omitted), cert. denied, 537 U.S. 822 (2002), and a "probation officer is duty bound to report wrongdoing by the [probationer] when it comes to his attention," Minnesota v. Murphy, 465 U.S. 420, 432 (1984) (or "Murphy") (internal quotation marks omitted). Neither the fact that Pierce's performance of his responsibilities involved providing information to other government agencies that enabled those agencies to perform their own functions, nor the fact that he put his first-hand information as to Jennings's admissions into the affidavit form that best allowed those agencies to perform their duties, placed Pierce's actions beyond the scope of his own statutory authority.

15

## 2. Separation of Powers

Under Article III of the Constitution, the province of the Judicial Branch of the federal government is the adjudication of the rights and obligations of the parties to cases or controversies under the applicable laws. The USPO is "a legally constituted arm of the judicial branch." United States v. Inserra, 34 F.3d 83, 88 (2d Cir. 1994); see 18 U.S.C. § 3602(a) ("A district court of the United States shall appoint qualified persons to serve . . . as probation officers within the jurisdiction and under the direction of the court making the appointment."). Article II of the Constitution gives the Executive Branch of the government "exclusive authority and absolute discretion to decide whether to prosecute a case." United States v. Nixon, 418 U.S. 683, 693 (1974).

The doctrine of separation of powers prohibits any Branch of the federal government from exercising "control or coercive influence, direct or indirect," over either of the other Branches. Mistretta v. United States, 488 U.S. 361, 380 (1989) (internal quotation marks omitted). But "[t]his is not to say that the three branches are not co-ordinate parts of one government and that each in the field of its duties may not invoke the action of the two other branches in so far as the action invoked shall not be an assumption of the constitutional field of action of another branch." J. W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 406 (1928) ("Hampton"). The Framers of the Constitution "did not require--and indeed rejected--the notion that the three Branches must be entirely separate and distinct." Mistretta, 488 U.S. at 380. In order to "determin[e] what [one branch] may do in seeking assistance from another branch, the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the governmental co-ordination." Hampton, 276 U.S. at 406.

The district court, applying these principles, observed that

> [t]he USPO's statutory duties of keeping informed of whether a probationer is complying with the conditions of release necessarily overlap some law enforcement duties. . . . That the results of the USPO's duties may have dual uses (i.e. forming the basis for a revocation of supervised release and the initiation of new criminal charges) does not run afoul of the separation of powers. In this case, the undisputed evidence is that the USAO was involved in the criminal investigation from an early stage. The record evidence is that the USAO: (1) conferred with the USPO concerning obtaining a search warrant; (2) prepared the warrant application based on information obtained from the USPO; (3) presented the warrant to this Court; (4) made the decision to file new criminal charges; (5) made the decision as to which criminal charges to pursue, see Gov't Mem. of Law at 19; (6) prepared the felony complaint, see Lovric Aff. at ¶ 23; (7) filed the criminal charges; (8) presented the matter to a grand jury; and (9) continues to prosecute the charges against Defendant. The probation officer has no role in how the information submitted to the USAO is used by it. See United States v. Hook, 471 F.3d 766, 777 (7th Cir.2006). Inasmuch as the Executive Branch has been involved from an early stage and has made the critical determinations whether, and how, to proceed with new criminal charges against Defendant, the Court finds no encroachment that violated the separation of powers doctrine.

2009 WL 4110852, at *3 (footnote omitted) (emphases added).

Jennings's contention that "[i]f [Pierce] thought that Jennings had committed a violation," he could do no more than "notify the sentencing court of his findings by way of petition for revocation of supervision" (Jennings Memorandum at 6-7 (emphases added)) falls of its own weight. Any transformation of "thought[s]" into "findings" plainly required investigation; the supervised-release conditions expressly permitted Pierce to search Jennings's residence and permitted him to enlist FBI assistance to do so; and he was "duty bound to report wrongdoing by [his supervisee] when it [came] to his attention," Murphy, 465 U.S. at 432.

Jennings's assertions that Pierce usurped the Executive Branch's prosecutorial function are conclusory. Jennings proffered no evidence to contradict Lovric's affirmation stating that it was the USAO that drafted and applied for the search warrant and that the USAO drafted and filed the

17

criminal complaint. The Pierce affidavits and Lovric affirmation, showing that Pierce merely informed the FBI and the AUSA of Jennings's admissions of wrongdoing and then provided the information under oath in order to allow the Executive Branch to perform its duties, were not called into question by any proffer of evidence by Jennings. We conclude that there was no separation-of-powers violation, substantially for the reasons stated by the district court.

### 3. Delay in Reporting Jennings's Failure of the CVSA

Jennings also points out that Pierce did not inform the district court of Jennings's failure of the February 19 CVSA examination until February 26, and he contends that he is entitled to dismissal of the Indictment on the ground that Pierce violated a statutory requirement that he report any violation of a supervised-release term to the court "'immediately.'" (Jennings reply brief on appeal at 7 (quoting 18 U.S.C. § 3603(8)(B)); see also Jennings brief on appeal at 39.) As Jennings did not make this argument in the district court, it is reviewable only for plain error. See, e.g., Fed. R. Crim. P. 52(b); United States v. Brown, 352 F.3d 654, 663 (2d Cir. 2003).

> Under the standard set by the Supreme Court for the application of Rule 52(b), before an appellate court is allowed to correct an error that was not timely raised in the district court four conditions must be met. "[T]here must be (1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights'"; and "[i]f all three" of those "conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" Johnson v. United States, 520 U.S. 461, 467 . . . (1997) (quoting United States v. Olano, 507 U.S. 725, 732 . . . (1993)) (other internal quotation marks omitted).

United States v. Pescatore, 637 F.3d 128, 141-42 (2d Cir. 2011). We doubt that Jennings's immediacy argument meets the first two parts of this test, and it surely does not meet the last two.

We question whether Pierce's week-long delay in informing the district court that Jennings had failed the CVSA violated § 3603 for two reasons. First, although Jennings could have violated a supervised-release condition if he had refused to submit to the CVSA, it is hardly clear that he could violate a condition simply by giving answers that appeared to be deceptive. Second, assuming that giving deceptive answers would constitute such a violation, it seems doubtful, given the structure of § 3603 (quoted in Part II.A.1 above), that the immediacy requirement invoked by Jennings here was applicable. A probation officer is in general required to keep informed of and "report [the supervisee's] conduct and condition to the sentencing court." 18 U.S.C. § 3603(2). Given the purposes of supervised release, a requirement of appropriate promptness is implicit. See, e.g., Guidelines § 7B1.2 (Policy Statement) (any alleged supervised-release violation punishable by imprisonment for more than one year should be reported by the probation officer to the court "promptly"; other violations, unless required by the court, need not be reported promptly if the probation officer determines that they are minor, sporadic, and pose no "undue risk to an individual or the public"). In § 3603, only subpart (B) of subsection (8) states any requirement of "immedia[cy]." If Congress had intended to require immediacy with respect to every report of a supervised-release violation by any supervisee, we would have expected that requirement to be set out in each subsection requiring a report or in a subsection of its own, rather than as a subpart of one subsection.

Further, in subsection (8)--in subpart (B) of which the "immediate[] report[ing]" requirement appears--subpart (A) deals with the monitoring of persons "conditionally released under the provisions of section 4243 or 4246 of this title," 18 U.S.C. § 3603(8)(A); those are persons who have been "found not guilty only by reason of insanity," id. § 4243 (emphasis added), or who are "due

19

for release but suffering from <u>mental disease or defect</u>," <u>id</u>. § 4246 (emphasis added). Subsection (8) was added to 3603 in 1992, <u>see</u> Pub. L. No. 102-572, Title VII, § 701(a), and its legislative history suggests that its purpose was to "give Probation . . . Officers[] <u>specific authority for follow-up services under the Insanity Defense Reform Act</u>," H.R. Rep. No. 102-1006(I), at 26 (Oct. 3, 1992) (emphasis added), <u>reprinted in</u> 1992 U.S.C.C.A.N. 3921, 3935. We see no indication that subpart (B) of subsection (8), whose subpart (A) is of quite limited application, was intended to apply to other subsections of § 3603.

Accordingly, we doubt whether Pierce's one-week delay in informing the court of Jennings's failure of the CVSA was an error; and if it was an error, it was hardly plain. Nor can we see that that delay affected Jennings's substantial rights. Pierce told the court on February 19 about Jennings's affirmative admissions on that date that he had been using his brother's computer to view child pornography. It is difficult to fathom how Pierce's failure at that time to convey additional information that was adverse to Jennings caused Jennings any prejudice.

Finally, given that Pierce informed the court on February 19 about the self-incriminating admissions Jennings had made that day, it would be the dismissal, not the nondismissal, of the Indictment for the lack of a contemporaneous disclosure of Jennings's CVSA failure, that would negatively affect the fairness, integrity, or public reputation of judicial proceedings.

B. <u>The Arguments for Suppression of Evidence</u>

In support of his challenge to the district court's denial of his motion to suppress, Jennings contends principally that because his supervised release conditions required him to "answer truthfully all inquiries by the probation officer," Child Pornography Judgment I, at 3, the self-

20

incriminating statements he made in his February 19 interview with Pierce were protected by the Fifth Amendment on the ground that they were compelled statements (see Jennings brief on appeal at 26-33). We conclude that because Jennings did not invoke his Fifth Amendment privilege against self-incrimination in that interview, this contention is foreclosed by Minnesota v. Murphy, 465 U.S. 420.

The Fifth Amendment provides, in pertinent part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V (emphasis added). "[T]his prohibition not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'" Murphy, 465 U.S. at 426 (quoting Lefkowitz v. Turley, 414 U.S. 70, 77 (1973) (emphasis ours)). "In all such proceedings, 'a witness protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant'"; and "'if he is nevertheless compelled to answer'" without such protection, "'his answers are inadmissible against him in a later criminal prosecution.'" Murphy, 465 U.S. at 426 (quoting Lefkowitz, 414 U.S. at 78). Thus, if an individual "asserts the privilege, he may not be required to answer a question if there is some rational basis for believing that it will incriminate him, at least without at that time being assured that neither it nor its fruits may be used against him in a subsequent criminal proceeding." Murphy, 465 U.S. at 429 (internal quotation marks omitted) (first emphasis ours; second emphasis in original).

21

The Fifth Amendment privilege against self-incrimination, however, "generally is not self-executing," id. at 425 (emphasis added), and self-incriminating statements made by a person to his probation officer, where there was no threat that the invocation of the privilege would subject him to penalty, fall within this general principle, see id. at 435-36.

> "The [Fifth] Amendment speaks of compulsion. It does not preclude a witness from testifying voluntarily in matters which may incriminate him. If, therefore, he desires the protection of the privilege, he must claim it or he will not be considered to have been 'compelled' within the meaning of the Amendment."

Murphy, 465 U.S. at 427 (quoting United States v. Monia, 317 U.S. 424, 427 (1943) (emphasis ours)).

So long as the probationer has not been told that he would lose his freedom if he invoked his Fifth Amendment privilege, a statement is not deemed "compelled" merely because the probation officer has the authority to "compel [the probationer's] attendance and truthful answers," or because the probation officer "consciously sought incriminating evidence." Murphy, 465 U.S. at 431; see id. at 435 (government authority "may require a probationer to appear and discuss matters that affect his probationary status," and "such a requirement, without more, does not give rise to a self-executing [Fifth Amendment] privilege"). If the person under supervision "was free to claim the privilege and would suffer no penalty as the result of his decision to do so," and did not assert the privilege but instead "cho[se] to answer, his choice is considered to be voluntary." Id. at 429.

In the present case, which, despite Jennings's efforts to distinguish it, is not meaningfully different from Murphy, the district court found "nothing before the Court suggesting that Defendant's ability to remain on probation was conditional on his waiving his Fifth Amendment privilege," 2009 WL 4110852, at *6; and we see nothing in the record to suggest that that finding is erroneous.

22

Jennings argues that because his supervised-release terms contained a provision for self-executing Fifth Amendment protection with respect to statements made during a polygraph or CVSA examination, he was reasonably led to believe that his admissions during his February 19 interview would be automatically privileged. (See Jennings brief on appeal at 28-30.) This contention lacks any subjective or objective foundation. Jennings submitted no affidavit or affirmation to the district court stating that he had any subjective belief that his statements to Pierce in the interview were privileged. Nor was there any objective basis for such a belief. Paragraph 5(a) of the supervised-release conditions provided that Jennings was subject to "examinations using a polygraph, computerized voice stress analyzer, or other similar device," that he had a Fifth Amendment right to challenge in a court of law the use of his statements in answer to questions posed "during the examination," and that he would be deemed not to have waived his Fifth Amendment rights "[i]n this regard." Modification Order at 1. Nothing in this paragraph could give Jennings reason to believe that he automatically had Fifth Amendment protection for his admissions in an interview outside of such an examination.

Finally, we note that, in an effort to avail himself of the Fifth Amendment protection that the supervised-release terms provided for statements made in a CVSA examination, Jennings seeks to raise a factual issue, arguing that the district court erred "in Failing to Find Jennings First Admitted to Viewing Child Pornography During a Computer Voice Stress Analyzer Examination" (Jennings brief on appeal at 21 (emphases added)), rather than in an interview with Pierce (see id. at 21-25). This contention is meritless, for it was not raised in the district court and Jennings proffered no evidence in the district court from which the court could have found that Jennings did not make admissions before being subjected to the CVSA. The motion to suppress was not

accompanied by any affidavit or affirmation from Jennings; and neither Jennings's memorandum of law nor the affirmation submitted by his attorney adverted to such a possibility. Although Jennings's brief on appeal asserts that Pierce's "contemporaneous notes confirm th[e] fact" that "Jennings's admissions were not made until he submitted to a CVSA" (id. at 23), the notes themselves, which have been submitted to this Court under seal, do not support that assertion. In the absence of any presentation of this argument to the district court, and in the absence of any apparent evidentiary basis for it, the district court did not err in not making the finding for which Jennings argues here.

In sum, because Jennings did not assert his Fifth Amendment privilege in his February 19 interview with Pierce, the district court properly denied the motion to suppress the self-incriminating statements made during that interview and the physical evidence seized pursuant to the search warrant obtained on the basis of those statements.

C. The Supervised-Release-Violation Judgment

Jennings's conditional challenge to the Supervised-Release-Violation Judgment is that, for his supervised-release violations, he was subject to enhanced punishment--to wit, a mandatory 60-month prison term and a life term of supervised release--because of his new conviction, see 18 U.S.C. § 3583, and that his punishment for those violations should be reduced if Child Pornography Judgment II is set aside. Since we have rejected all of Jennings's challenges to Child Pornography Judgment II, his challenge to the Supervised-Release-Violation Judgment is moot.

24

# CONCLUSION

We have considered all of Jennings's contentions on this consolidated appeal and have found them to be without merit.  The judgments of the district court are affirmed.