**UNITED STATES of America,**
**Appellee,**

v.

**Jeffrey A. JOHNSON, Defendant–**
**Appellant.**

**Docket Nos. 04–4992 CR, 05–**
**0248(L), 05–0256(CON).**

United States Court of Appeals,
Second Circuit.

Argued: Oct. 17, 2005.

Decided: May 1, 2006.

---

Bruce R. Bryan, Syracuse, NY, for Defendant–Appellant Jeffrey A. Johnson.

Robert P. Storch, Assistant United States Attorney (Glenn T. Suddaby, United States Attorney for the Northern District of New York, of counsel, Thomas Spina, Jr., Assistant United States Attorney, on the brief), for the United States of America.

Before: JACOBS, CABRANES, and SACK, Circuit Judges.

DENNIS JACOBS, Circuit Judge.

Jeffrey A. Johnson ("Johnson") is currently serving three years of supervised release, imposed by the United States District Court for the Northern District of New York (Thomas J. McAvoy, *Judge* ) as part of his sentence for sexual predation against minors. He challenges certain modifications to his conditions of supervised release.[1] Johnson argues that: (i) mandatory polygraph testing to ensure compliance with the terms of his supervised release is not reasonably related to the purposes of sentencing and is a violation of his Fifth Amendment rights against self-incrimination; (ii) a bar on direct or indirect contact with minors is unconstitutionally vague; and (iii) a ban on using any computer with Internet access is an excessive deprivation of liberty.

## BACKGROUND

a.  *Johnson's Criminal History*

Johnson is a convicted sex offender. He is also an Aerospace Engineer and a sophisticated user of computers. Between 1995 and 1997, Johnson used the Internet

---

[1]. The pertinent modifications were imposed as part of two orders. The first order was entered on August 19, 2004 and contained the polygraph and indirect contact modifications. The second order was entered on January 5, 2005, and contained the Internet-ban modification.

to conduct sexually-explicit conversations with minors, and to lure several of them to meetings. He had sex with two minors and was arrested while on his way to have sex with a third.

Johnson pleaded guilty and was principally sentenced to 88 months in prison to be followed by three years of supervised release. Conditions governing Johnson's supervised release were ordered in three waves. At sentencing, the court imposed three conditions: (1) that Johnson participate in a mental health evaluation and/or treatment program; (2) that Johnson not associate with any individual under the age of 18 (except by permission of his probation officer); and (3) that Johnson not possess or use a computer to access any on-line computer service (except by permission of his probation officer).

On July 22, 2004, the Probation Department petitioned for several modifications to Johnson's conditions of supervised release: (1) mandatory sex-offender treatment using polygraph testing "to obtain information necessary for risk management and treatment"; (2) a prohibition on direct or indirect contact with minors and presence in areas in which minors are likely to congregate (such as schools, child care centers, and playgrounds); and (3) relaxation of the previous total ban on Johnson's computer use if Johnson participated in the Computer Restriction and Monitoring Program, which would have allowed the Probation Office to install software aimed at monitoring his computer use. Johnson challenged all of these modifications.

b. *Polygraph Testing*

Johnson objected to polygraph testing on two grounds. First, he argued that, without use and derivative use immunity, he could be deprived of his Fifth Amendment rights against self-incrimination and

face the dilemma of confessing his sins or remaining silent (and going to jail for violating a condition of supervised release). Second, Johnson argued that the district court should not impose polygraph testing because such testing is unreliable and not reasonably related to the purposes of sentencing, and therefore cannot be employed in a special condition of supervised release.

The district court agreed with the Probation Department on the benefits of polygraph testing, but partially accommodated Johnson's Fifth Amendment concern by adding certain safeguards. The court limited the scope of examinations to "information necessary for supervision, case monitoring, and treatment," and made clear that (though Johnson would be compelled to answer) "if a truthful answer would expose him to a prosecution for a crime different from the one on which he was already convicted," he would preserve his "right to challenge in a court of law the use of such statements as violations of his Fifth Amendment rights"—or, "[i]n other words, [Johnson] must answer the questions posed to him, but, by answering, he will not be waiving his Fifth Amendment rights with respect to any criminal prosecution unrelated to the conviction for which he is now on supervised release." Johnson appeals these rulings.

c. *Ban on Direct and Indirect Contact with Minors*

The second modification sought by the Probation Department was to prohibit "any direct or indirect contact with a person under age 18." Johnson challenged this proposed modification as both vague and impossible: vague, because it "provides no notice to [him] as to what conduct he is prohibited from engaging in"; impossible, because "the possibilities for making inadvertent 'indirect' contact with persons under age 18 are a virtual certainty upon

[his] leaving his house and conducting normal day to day business."

The district court agreed with Johnson that "the word 'indirect' casts too broad of a net" and modified Johnson's conditions to require that he "reasonably avoid and/or remove himself from situations in which he has indirect contact with a minor." The modified conditions also require that "[Johnson] shall not have any direct contact with a person under the age of 18 unless it is supervised by a person approved of by the probation officer." The modification also takes into account the indeterminacy of the word "indirect" by decreeing that Johnson "shall not have indirect contact with a person under the age of 18 *through another person or through a device (including a telephone, computer, radio, or other means* ) unless it is supervised by a person approved of by the probation officer." (emphasis added). Johnson argues that in spite of the district court's stated objective, the plain language of the modification still allowed for inadvertent violation. The government supports the ban as worded.

d. *Modification Banning Use of Computers with Internet Access*

Johnson objected to computer monitoring; his objection became moot when this condition was modified a second time. In December 2004 the Probation Department, in response to the comments of treatment officials, requested a further modification of Johnson's conditions of supervised release. The Government sought to bar Johnson from using any computer with Internet access, until his progress in treatment reduced his risk of recidivism. The district court ordered an evidentiary hearing to explore the tension between Second Circuit precedent guaranteeing minimal Internet access and the perceived necessity of an outright ban in this case.

At the two-day hearing, Johnson's Probation Officer—Agnes McBride—testified that Johnson was expelled from treatment by the Tompkins County Mental Health Clinic ("Treatment Agency") for failing to agree to refrain from using the Internet and for otherwise failing to participate fully in his program. Ms. McBride accused Johnson of complying with his treatment program "superficially," doing what he was specifically asked to do without "acknowledg[ing] that he needs to make any changes in his life-style." Ms. McBride viewed this generally resistant attitude as a sign that Johnson remained a high risk to re-offend, and that stepped-up limits on Internet access were needed.

Linda Riley, a clinic supervisor with the Treatment Agency, confirmed that an outright ban on Internet access was needed for Johnson's treatment: "[T]he Internet is an instrument of his offending ... Access to the Internet is a risk situation because he does not have the internal controls ... necessary to not offend."

Johnson sponsored the testimony of Dr. Richard Maxwell, a clinical psychologist whose clinical practice centered on depression, anxiety disorders, and marital problems, and who devoted only a "small amount" of his practice to sex offenders. Dr. Maxwell opined that access to the Internet would allow Johnson to develop socially and professionally, but conceded that "I don't ... really know at this point ... whether Mr. Johnson is a pedophile or ... somebody with a sexual addiction," and added that his risk assessment of Johnson's Internet use "obviously ... would be wrong" "[i]f he's a pedophile."

The district court adopted the proposed modification. In so doing, the court distinguished Second Circuit cases (which had held outright Internet bans to be overbroad) on several grounds: use of the Internet in the commission of Johnson's pre-

vious offenses; the severity of Johnson's offenses; fear that Johnson—a computer expert—could circumvent any lesser restriction; and the treatment necessity for an outright ban.

## DISCUSSION

■ In reviewing conditions of supervised release imposed by a district court, issues of law are reviewed *de novo. United States v. Lifshitz*, 369 F.3d 173, 178 (2d Cir.2004). Conditions of supervised release are judged by an abuse of discretion standard, where any error of law constitutes an abuse of discretion. *United States v. Doe*, 79 F.3d 1309, 1319–20 (2d Cir.1996).

### I. Polygraph Testing

Federal sentencing policy requires that conditions of supervised release impose no greater restraint than reasonably necessary to promote sentencing goals. We have never considered whether polygraph testing is a condition that satisfies this test, nor have we considered whether such a condition offends the Fifth Amendment right against self-incrimination.

### a. *Objectives of Sentencing*

■ The district courts may:
impose special conditions of supervised release to the extent that they are 'reasonably related' to (i) the nature and circumstances of the offense and the history and characteristics of the defendant, and (ii) the purposes of sentencing, including the need to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed training or treatment.

*United States v. Germosen*, 139 F.3d 120, 131 (2d Cir.1998) (citing, *inter alia*, 18 U.S.C. § 3583(d)). Conditions of supervised release may restrict liberty to the

extent reasonably needed to achieve the above purposes. *Id.; see also United States v. Lifshitz*, 369 F.3d 173, 189 (2d Cir.2004). Citing the asserted unreliability of the polygraph, Johnson argues that the condition is not reasonably related to the pertinent sentencing factors and imposes a greater deprivation on his liberty than is reasonably necessary.

Other circuits have concluded that polygraph testing may serve salutary purposes in the supervised release context. *See, e.g., United States v. York*, 357 F.3d 14, 22 (1st Cir.2004); *United States v. Dotson*, 324 F.3d 256, 261 (4th Cir.2003); *United States v. Lee*, 315 F.3d 206, 213 (3d Cir.2003); *United States v. Zinn*, 321 F.3d 1084, 1089–90 (11th Cir.2003). As *Lee* explained, a polygraph "may provide an added incentive for [the offender] to furnish truthful testimony to the probation officer. Such purpose would assist the officer in his or her supervision and monitoring of the appellant." *Lee*, 315 F.3d at 213. Obviously, the incremental tendency of polygraph testing to promote such candor furthers the objectives of sentencing by allowing for more careful scrutiny of offenders on supervised release. Polygraphs have also been found to assist another sentencing objective: "ensur[ing] compliance with probationary terms." *Zinn*, 321 F.3d at 1090. The lie detector may deter lying notwithstanding its arguable or occasional unreliability because of the subject's fear that it might work, or be credited by others whether it works or not. Notwithstanding the preceding case law, Johnson contends that an assertedly unreliable technology cannot advance honest discussion or compliance with conditions of supervised release.

Johnson cites, *inter alia, United States v. Scheffer*, 523 U.S. 303, 309–10, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998), for the proposition that polygraph evidence is unrelia-

ble. The *Scheffer* Court noted that studies have positioned polygraph reliability between greater–than–50% and 87%. *Id.* at 310, 118 S.Ct. 1261. Since even the bottom of the range is still more-likely-than-not, the technology produces an incentive to tell the truth, and thereby advances the sentencing goals.

As Johnson points out, polygraph results are inadmissible as evidence. But that does not much bear on the therapeutic value of the tool:

> [T]he polygraph test ... is inadmissible in nearly every circumstance at trial. Obviously, however, evidentiary cases do not govern our evaluation of the use of polygraphs in connection with the treatment of an offender. *The use of a polygraph test here is not aimed at gathering evidence to inculpate or exculpate [the offender]. Rather, the test is contemplated as a potential treatment tool upon [an offender's] release from prison*
> ....

*Dotson*, 324 F.3d at 261 (emphasis added) (internal citation omitted). Moreover, the exclusion of polygraph evidence in many cases has been based in part on a risk of prejudicial effect. *See, e.g., United States v. Kwong*, 69 F.3d 663, 668 (2d Cir.1995); *see also United States v. Williams*, 95 F.3d 723, 729–30 (8th Cir.1996). Prejudice is not as salient a risk in the absence of a jury; generally speaking, sentencing judges are better equipped to decide what weight if any to afford polygraph results.

The case for use of polygraph testing is strong here in light of "the nature and circumstances of the offense and the history and characteristics of the defendant." *Germosen*, 139 F.3d at 131. The district court crafted supervised release conditions for a serial offender who apparently resisted honest self-assessment. Johnson's treatment provider labeled Johnson's attitude "superficial and not adequately en-

gaged in the recovery process. He has an increasingly antagonistic attitude .... [featuring an] inadequate level of accountability for his offenses." The polygraph can help penetrate deception and encourage an offender to confront his own motivations and behaviors. These outcomes further sentencing objectives such as rehabilitation and deterrence, with reasonably small incremental deprivations of liberty. We therefore conclude that polygraph testing can, and in this case does, further sentencing goals without excessive deprivations of liberty.

#### b. *Fifth Amendment Challenge*

■ Johnson argues that if he commits future offenses, or is asked about past offenses other than the ones for which he was convicted, he will be put to the choice of incriminating himself (by answering polygraph questions truthfully) or violating supervised release (by answering untruthfully, or not at all). The first question is whether this challenge is ripe. *See United States v. Antelope*, 395 F.3d 1128, 1132 (9th Cir.2005) ("The constitutional component of ripeness is a jurisdictional prerequisite.") Article III of the Constitution, which limits our jurisdiction to cases and controversies, precludes resolution in the absence of "direct and immediate dilemma." *Marchi v. Bd. of Coop. Educ. Servs.*, 173 F.3d 469, 478 (2d Cir.1999). "The mere possibility of future injury, unless it is the cause of some *present detriment*, does not constitute [the requisite] hardship." *Simmonds v. INS*, 326 F.3d 351, 360 (2d Cir.2003) (emphasis added).

At the moment, Johnson has suffered no injury from polygraph testing; but he can be injured because he might end up in jail if he truthfully confesses a new offense during testing, falsely denies it, or invokes the Fifth Amendment to avoid answering. Yet, Johnson may not have committed of-

fenses in the past other than those for which he was convicted, and he may abstain from criminal activity while on supervised release; even if he does not, Johnson's probation officer may never ask a question sufficiently probing to justify invocation of the Fifth Amendment, or an incriminating answer may be ignored by prosecutors, or the district court may find no supervised release violation.

Although it does not appear that we have previously considered ripeness in the context of a challenge such as that made by Johnson, several other circuit courts have considered similar challenges, and all have found them ripe for decision, regardless of whether the defendant had yet suffered penal injury. In *Antelope,* 395 F.3d at 1132–33, for example, the Ninth Circuit concluded that a defendant who had been incarcerated for a refusal to answer questions that he deemed incriminating while on supervised release could raise a Fifth Amendment challenge to the revocation of that release. In *United States v. Zinn,* 321 F.3d 1084, 1088 (11th Cir.2003), the Eleventh Circuit deemed ripe the appeal of a defendant who argued, *inter alia,* that a condition of supervised release requiring him to submit to polygraph examinations violated the Fifth Amendment, even though the defendant had not yet been released from prison and therefore had not yet been subject to the challenged condition. The court concluded that although the defendant could not yet challenge the precise *implementation* of the polygraph condition, *id.* at 1089, 1091, his general "challenge to the polygraph exam [was] neither premature nor speculative." *Id.* at 1088; *see also United States v. Davis,* 242 F.3d 49, 51 (1st Cir.2001) (*per curiam*) (ruling that although a defendant had not yet been released from prison and therefore was not yet subject to supervised release conditions, his challenge to a polygraph condition was ripe because he "faces

a sufficiently direct and immediate dilemma . ... as he seeks to determine whether exercising his Fifth Amendment privilege in response to questions by his probation officer will result in revocation of his supervised release" (internal quotation marks and citations omitted)); *cf. United States v. Lee,* 315 F.3d 206, 210–13 (3d Cir.2003) (without mentioning ripeness, entertaining a challenge to a polygraph condition by a defendant not yet on supervised release).

Generally, a challenge lacks ripeness if it concerns abstract regulations or if it presents issues that might never arise. *See Motor Vehicle Mfrs. Ass'n v. New York State Dept. of Envtl. Conservation,* 79 F.3d 1298, 1305 (2d Cir.1996). A case may be ripe even before formal enforcement if a "direct and immediate" impact is suffered from the challenged policy. *Abbott Labs. v. Gardner,* 387 U.S. 136, 152, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds, Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). Ripeness is satisfied by a "direct *threat* of personal detriment" such that litigants "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973) (emphasis added).

Unless the self-incrimination issue raised by a condition of supervised release is deemed ripe when it is imposed, an offender who believes the Fifth Amendment protects his statements must face the threat of prison, either in a new criminal prosecution or in a revocation proceeding. Johnson's challenge is therefore ripe.

■ On the merits, though, Johnson fails. Second Circuit precedent allows the revocation of supervised release of an offender who fails to answer questions even if they are self-incriminating. In *Asher-*

man v. Meachum, 957 F.2d 978 (2d Cir. 1992) (en banc), supervised release was revoked when the offender refused to answer questions about a crime for which we assumed he might have been prosecuted. *Id.* at 980–81. This Court rejected Asherman's Fifth Amendment challenge, reasoning that revocation is an administrative decision that may be made based on a refusal to answer relevant questions, so long as the administrator does nothing to impair the later invocation of the privilege. *Id.* at 982–83. The Court explained that the probation administrator

> stayed well within [his] authority . . . by conducting a relevant inquiry and then taking appropriate adverse action, not for [the offender's] invocation of his constitutional rights, but for his failure to answer a relevant inquiry. . . . [A] prisoner may be terminated from home release status for refusing to divulge to a corrections commissioner information pertinent to the administration of a home release program.

*Id.* at 983.

Johnson's dilemma is harsh but it is not of constitutional salience. The only distinction between *Asherman* and this case is the polygraph. But as Johnson admitted at oral argument, the use of the lie detector has no impact on Fifth Amendment considerations. *Asherman* therefore applies directly. The polygraph condition at issue here conforms to *Asherman* by preserving Johnson's "right to challenge in a court of law the use of [incriminating] statements as violations of his Fifth Amendment rights."

## II. The Bar on Direct and Indirect Contact

■ The district court tried to make Johnson "cognizant of the requirement that he reasonably *avoid and/or remove himself* from situations in which he has indirect contact with a minor." (emphasis added). This goal was implemented in the following four modifications:

3. You shall not have any *direct* contact with a person under the age of 18 . . . .

4. You shall not have *indirect* contact with a person under the age of 18 through another person or through a device (including a telephone, computer, radio, or other means) . . . .

5. You shall *reasonably avoid and remove yourself* from situations in which you have *any other form* of contact with a minor.

6. You shall not be in any area in which persons under the age of 18 are likely to congregate, such as school grounds, child care centers, or playgrounds . . . .

(emphasis added). Johnson challenges the direct and indirect contact conditions of his supervised release as unconstitutionally vague. According to Johnson, "the condition of supervised release is missing language pertaining to . . . intent or awareness," such that "Johnson might innocently or unintentionally have indirect contact with a minor that would violate [a] condition of supervised release."

■■ The Due Process clause requires that "Conditions of supervised release . . . 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.'" *United States v. Balon,* 384 F.3d 38, 43 (2d Cir.2004) (quoting *United States v. Simmons,* 343 F.3d 72, 81 (2d Cir.2003)). However, conditions need not "be cast in letters six feet high, or . . . describe every possible permutation, or . . . spell out every last, self-evident detail. Conditions . . . may afford fair warning even if they are not precise to the point of pedantry."

*United States v. Gallo,* 20 F.3d 7, 12 (1st Cir.1994).

In response to Johnson's concerns, the district court expanded on the wording sought by the government, and specified that "indirect" contact includes contact through a device (such as a phone) or through an intermediary (such as another person). The court thus refined the term to involve some purposeful initiative. As so modified, even the maximal scope of the contact provisions allows a person of ordinary intelligence to know what is prohibited.

When Johnson protested that the government's proposed condition might "result in a violation based on unintentional conduct," the court agreed "that the word 'indirect' casts too broad of a net." The court's decision expressed the intent to limit the modification to ensuring that Johnson is "cognizant of the requirement that he reasonably avoid and/or remove himself from situations in which he has indirect contact with a minor."

Generally, supervised release provisions are read to exclude inadvertent violations. In *Arciniega v. Freeman,* the Supreme Court assumed that a term barring "association" with ex-convicts does not cover "incidental contacts." 404 U.S. 4, 4, 92 S.Ct. 22, 30 L.Ed.2d 126 (1971) *(per curiam ).* This rule of construction likewise applies here to quiet Johnson's concerns.

Finally, the structure of the supervised release modifications clearly indicates that inadvertent contact with minors does not (without more) result in a violation. In addition to the direct and indirect contact provisions, the district court required Johnson to "reasonably avoid and remove" himself from situations in which he has any contact with a minor. If Johnson's failure to leave triggers a supervised release violation, it follows that he may avoid a violation by extricating himself from situations in which inadvertent contact with minors occurs. Absent an inadvertent encounter with a minor that is precipitated by some lack of care to avoid it, the modified conditions assure that no violation occurs where incidental contact is followed by immediate removal.

Since the conditions provide clear notice of what conduct they prohibit and do not demand the impossible, Johnson's vagueness challenge fails.

## III.  Absolute Internet Ban

■ The new Internet condition required that Johnson "not use or possess any computer . . . with online capabilities at any location until . . . cleared to do so" by the district court. Johnson argues that this outright ban contravenes several precedents in which this Court has preserved at least minimal, government-monitored Internet access for persons on supervised release.

### a.  *Sentencing objective relevance*

As already discussed, a condition of supervised release must be related to sentencing purposes and must impose no greater restraint on liberty than is reasonably necessary to accomplish sentencing objectives. *United States v. Germosen,* 139 F.3d 120, 131 (2d Cir.1998). Restrictions on Internet use may serve several sentencing objectives, chiefly therapy and rehabilitation, as well as the welfare of the community (by keeping an offender away from an instrumentality of his offenses). *See generally Lifshitz,* 369 F.3d at 189–90 (listing deterrence and rehabilitation as two benefits of Internet monitoring).

The Internet ban imposed on Johnson serves these sentencing objectives, confronts Johnson with the need to take his treatment seriously, and serves as an external control to predatory Internet be-

havior, standing in for Johnson's deficient internal controls. Treatment officials suggest that such external checks often become internalized, promoting healthy behavior in the long term. The question is whether a lesser restraint would do.

### b. *Minimum Deprivation of Liberty*

Several times this Court has vacated absolute bans on Internet access because narrower restraints were equally suited to achieving sentencing goals. The district court distinguished those cases on the ground that nothing less will effectively curb Johnson's propensities and protect the community. On this record, that ruling is sound.

In the case of an offender who had downloaded and disseminated child pornography through the Internet, an outright ban was held to be more restrictive than needed to serve the sentencing goals of rehabilitation and incapacitation because a combination of monitoring and unannounced inspections would exert the control of an Internet ban while allowing an offender access to the Internet for legitimate purposes. *See United States v. Sofsky,* 287 F.3d 122, 126–27 (2d Cir.2002); *see also United States v. Cabot,* 325 F.3d 384, 386 (2d Cir.2003) (vacating an Internet ban after the government conceded that it could not stand under *Sofsky* ); *United States v. Peterson,* 248 F.3d 79, 82– 84 (2d Cir.2001) (vacating a computer and Internet ban, reasoning that, *inter alia,* "[t]here [was] no indication that Peterson's past incest offense had any connection to computers or to the Internet.").

As shown in the thorough record compiled in the district court, Johnson's case differs from those cases on two important grounds: the characteristics of the offender and the nature of his past offenses.[2]

After a two day evidentiary hearing at which both Johnson and the government called witnesses and presented other evidence, the district court found, *inter alia,* that Johnson was in denial about his risk of re-offending, had not come to terms with what caused him to commit his crimes, had been "less than truthful with his mental heath care providers and with probation," and had "acted in a secretive manner concerning his sexual activity." The district court also found credible the testimony of Johnson's treatment provider that these actions suggested that Johnson was at a high risk for re-offending. *See United States v. Johnson,* No. 97–cr–0206, 98–cr–160, 2005 WL 22680 (N.D.N.Y. Jan.5, 2005). These findings are supported by the record.

In addition, as Johnson concedes, he is a sophisticated computer user (and an experienced engineer), and the district court found that a person with his skills likely could circumvent the software needed for monitoring. Johnson's employer believes that inappropriate Internet abuse at work "would be noticed very rapidly" due to the office's public culture, and it may be that co-workers would notice if Johnson were accessing and downloading pornographic images (at least during normal business hours), and that Johnson would strongly prefer to keep such images from the sight of others. However, chatting, emailing and messaging can be conducted without tell-tale screen images, and co-workers may be gone after work hours or on weekends. The court did not abuse its discre-

---

**2.** We do not hold that an outright ban on Internet use is categorically appropriate for any sex offender whose offense involves use of the Internet. We think that, in light of our recognition that "Internet access ha[s] become virtually indispensable in the modern world of communications and information gathering," *Peterson,* 248 F.3d at 83, a careful and sensitive individualized assessment is always required before such a ban is imposed.

tion in concluding that casual oversight in the workplace would not control a sex offender who is in need of treatment and who has engineering and computer skills that could be used to defeat monitoring by anyone.

In determining what condition of release is reasonably necessary to protect the community, a court may of course consider the hazard presented by recidivism. In *Sofsky,* the likeliest consequence if a less restrictive measure should fail would be that the offender would download and distribute child pornography. Serious as those offenses are, the direct harm to children was inflicted previously, when the pornographic images were made, and the lesser harm caused by trafficking can be largely remedied afterward, by destroying copies of the material and returning the offender to prison. In Johnson's case, the likeliest consequence if a less restrictive measure should fail is that Johnson could use the Internet to locate children and lure them to sexual abuse. The perfectly obvious ground for distinguishing *Sofsky* from Johnson's case is that here the failure of lesser measures risks direct harm to children that may be devastating and irremediable.

As the Seventh Circuit observed in *United States v. Holm,* 326 F.3d 872, 878 (7th Cir.2003), courts in similar contexts have recognized the importance of considering whether a defendant made "outbound use of the Internet to initiate and facilitate victimization of children." *Compare United States v. Paul,* 274 F.3d 155, 169 (5th Cir.2001) (upholding prohibition where the defendant had used the Internet to provide advice to others on how to find and obtain access to "young friends"), *and United States v. Crandon,* 173 F.3d 122, 127–28 (3rd Cir.1999) (upholding prohibition where the defendant had used the Internet to "develop an illegal sexual rela-

tionship with a young girl over a period of several months"), *with United States v. Freeman,* 316 F.3d 386, 391–92 (3rd Cir. 2003) (vacating prohibition where the defendant was convicted of receipt of child pornography, and noting that "the defendant in *Crandon* [by comparison] had used the Internet to contact young children and solicit inappropriate sexual contact with them. Such use of the Internet is harmful to the victims contacted and more difficult to trace than simply using the Internet to view pornographic web sites"), *and Holm,* 326 F.3d at 874, 879 (vacating prohibition on use of any computer with Internet capability by a defendant convicted of possession of child pornography).

We therefore affirm the imposition of the absolute Internet ban as it has been crafted in this case.

## CONCLUSION

We have considered Johnson's remaining arguments and find each of them to be without merit. For the foregoing reasons, the various orders of the district court modifying conditions of Johnson's supervised release are affirmed.