10-4802-cr
United States v. Ramos

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2011

Argued: January 31, 2012          Decided:   July 2, 2012

Docket No. 10-4802-cr

_____

UNITED STATES OF AMERICA,

*Appellee*,

v.

JAMES RAMOS,

*Defendant-Appellant*.

_____

Before:
        WINTER, RAGGI, and CHIN, *Circuit Judges*.

Appeal from a judgment of the United States

District Court for the Northern District of New York (David

N. Hurd, *J.*) convicting defendant-appellant, following a

jury trial, of receiving and possessing child pornography.

AFFIRMED.

BRENDA K. SANNES, Assistant United States Attorney, *of counsel*, *for* Richard S. Hartunian, United States Attorney for the Northern District of New York, Syracuse, New York, *for Appellee*.

VIVIAN SHEVITZ, Brooklyn, New York, *for Defendant-Appellant*.

CHIN, *Circuit Judge*:

Defendant-appellant James Ramos appeals a judgment of the United States District Court for the Northern District of New York convicting him of receiving and possessing child pornography in violation of 18 U.S.C. §§ 2252A(a)(2)(A), 2252A(a)(5)(B), 2256(8)(A), and 2256(8)(C). He argues, *inter alia*, that (1) his Fifth Amendment right against self-incrimination was violated because he was compelled as a parolee to make self-incriminating statements during a mandatory polygraph examination, and (2) the government failed to present sufficient evidence to prove he received or possessed child pornography in violation of federal law.

We AFFIRM.

## STATEMENT OF THE CASE

### A.    *The Facts*

Except as indicated, the following facts, drawn primarily from the evidence presented at the suppression hearing and the trial below, are not in dispute.

### 1.    *Background*

In 1990, Ramos was convicted in state court in Saratoga Springs, New York, of sexually abusing two sisters, ages ten and thirteen.  After serving approximately fourteen years in prison, he applied in February 2003 for release on parole.  In his application, he agreed to certain conditions of supervision, including permitting his parole officer to visit and search his residence and person, replying "promptly, fully and truthfully" to any inquiries from his parole officer, and "fully" complying with any instructions from his parole officer.  He also agreed to refrain from "possess[ing], seek[ing] access to or remain[ing] near any pornographic materials."  The application was granted, and Ramos was released from custody to the supervision of the New York State Division of Parole in May 2003.

On March 5, 2008, Ramos's parole officer told him that two new conditions -- polygraph testing and GPS monitoring -- were being added to his conditions of supervision because of changes in the procedures for sex offenders on parole. Ramos complained to his parole officer that the addition of the conditions "violated his rights." Ramos spoke with his parole officer several more times after March 5, 2008, and eventually agreed to participate in the polygraph examination, despite his initial reservations.

## 2. *The Statements*

On April 4, 2008, Ramos went to the Probation Office for a polygraph test. He first signed several forms. In one, he agreed that "failure to answer questions regarding my conformance to parole . . . conditions, in the discretion of the Parole Office and Polygraph Examiner, may be deemed as a failure to participate in a meaningful way and be submitted . . . as a parole . . . violation." In another, he stated: "I will participate in the Division of Parole's polygraph program as directed by my P.O. I understand this will include periodic polygraph sessions

. . . . I will answer all questions fully and truthfully as well as comply w/ any directives given to me by the polygraph examiner."  In yet a third he acknowledged that:

> 5.  Failure to fully cooperate and participate in any aspect of the polygraph examination session, including refusal to answer questions during the examination, may be grounds for violations of my parole.
>
> 6.  Answers to questions during the polygraph examination session may be used in determining appropriate sanctions to be implemented by the Division of Parole, including a parole violation hearing.  Additionally, admissions to criminal behavior will result in referral to appropriate law enforcement authorities for investigation and possible prosecution.
>
> 7.  Any admission to criminal behavior during the polygraph session may be used against me in a court of law.

(Appellee's App. at 137 (emphases omitted)).

In an interview before the test was administered, Ramos told the polygraph examiner that he had viewed both pornography and child pornography on his computer via the internet, "at least somewhere between twelve and eighteen times since his release to parole supervision."  Ramos took the test, and the results were inconclusive.  Afterwards, Ramos signed an "Admissions Form" in which he confirmed that

he had viewed pornography and child pornography "on at least 12 to 18 different occasions," on the internet in his home. Ramos's parole officer immediately imposed a new condition of parole forbidding Ramos from owning or operating a computer and using the internet.

### 3. *The Computers*

After Ramos left, the parole officer reported Ramos's admissions to U.S. Immigration and Customs Enforcement ("ICE") agents. The same day, April 4, 2008, two ICE agents went to Ramos's residence, a trailer home. They found him outside the trailer. They introduced themselves and said that they had information there might be child pornography on his computer. Ramos agreed to talk to them inside. The agents did not place Ramos under arrest, nor did they handcuff him. They asked him questions, and he admitted that he had a computer in his residence, he used the computer to access the Internet, he had searched for and viewed child pornography on the computer, and thus they would probably find child pornography on the computer.

At some point during the interview, the agents read Ramos his *Miranda* rights.[1]  He signed two consent forms, one to a search of his residence and one to a search of his computer equipment.  He refused to sign a third document.  The agents then conducted a search and seized a desktop computer.  As a forensic examination would later reveal, Ramos had used the computer to visit child pornography websites and view images of child pornography.  One of the hard drives had deleted "cookie" files from websites with names indicative of sexual interest in minors.  There were two deleted web pages with images that were not recoverable, but that bore the names "Lolita Photos" and "9-12yr Pics."  The hard drive had been used to conduct a Google search using words such as "twink," which suggested a search for child pornography.  One of the hard drives contained software called "Smart Protector Pro" that enabled

---

[1]     At the suppression hearing, Ramos denied receiving *Miranda* warnings at his home on April 4, 2008, although he testified that he was shown a piece of paper that "could have been" *Miranda* warnings.  The district court found, however, that Ramos was not in custody and that, in any event, *Miranda* warnings were given to him.

a user to delete his browser history.  There were some 140 images of child pornography in deleted space; the file names indicated these had been temporary internet files that had been deleted.

On November 20, 2008, a grand jury in the Northern District of New York indicted Ramos for knowingly receiving and possessing child pornography.  The next day, ICE agents and two parole officers returned to Ramos's residence to arrest him.  Again, he was outside the trailer.  The officers asked him to step inside so that they could talk to him, and he agreed.  Inside, the officers advised Ramos he was being arrested and handcuffed him.  The parole officers conducted a sweep of the trailer to determine whether anyone else was present and to look for evidence of any parole violation.  They saw computer equipment lying in plain view and discovered beneath the sheet of Ramos's bed a laptop computer that was halfway open.  The parole officers opened the laptop, clicked on an icon, and found images of what appeared to be child pornography.  The officers seized the laptop and obtained a warrant to search it further.

The laptop was manufactured in Korea and its hard drive was manufactured in Thailand. The hard drive had on it computer software called "Microsoft Picture It," which permitted a user to alter images. The laptop contained images modified to appear as if children were engaged in sexually explicit acts. The original, unaltered images of two young girls, panties, and a penis -- which had been used to create the altered image -- were also found on the computer.

B. *Proceedings Below*

On March 13, 2009, a grand jury in the Northern District of New York returned a superseding indictment against Ramos charging him with two counts of receiving child pornography, in violation of 18 U.S.C. §§ 2252A(a)(2)(A) and 2256(8)(A), and two counts of possession of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B), 2256(8)(A), and 2256(8)(C). The two sets of possession and receipt charges referred, respectively, to the two computers seized on April 4 and November 21, 2008.

In September 2009, Ramos moved to suppress his statements to parole officers and the evidence seized during the searches resulting from his statements. The district court denied the motions from the bench on April 5, 2010, following an evidentiary hearing. With respect to Ramos's statements made during the polygraph examination, the district court held that the statements were admissible because Ramos was not in custody.[2]

Ramos proceeded to trial *pro se*, with advisory counsel. Following a three-day trial, the jury convicted Ramos on three counts of receiving and possessing child pornography.[3]

---

[2]    Although Ramos had argued generally to the district court that his Fifth Amendment rights were violated by the "coercive" circumstances of the polygraph examination, he did not invoke the *Murphy* line of cases discussed below. *See Minnesota v. Murphy*, 465 U.S. 420 (1984). The government contends, therefore, that Ramos's *Murphy* argument is waived. We disagree, as we conclude that Ramos preserved the issue by arguing in the district court that he was forced to participate in the polygraph examination and that this compulsion was coercive in violation of the Fifth Amendment.

[3]    One of the counts was dismissed at the government's request at the start of the trial. Ramos was convicted on Count 1, which charged receipt of child pornography in connection with the computer seized on April 4, 2008, in violation of 18 U.S.C. §§ 2252A(a)(2)(A) and 2256(8)(A); Count 2, which charged

Ramos was sentenced on November 23, 2010. Because Ramos had previously been convicted of sexually abusing children, he was subject to a mandatory minimum sentence of imprisonment of fifteen years. *See* 18 U.S.C. § 2252A(b)(1). The district court sentenced Ramos to the statutory minimum: a term of 180 months' imprisonment on each of the three counts, to be served concurrently.

This appeal followed.

### DISCUSSION

Two principal issues are presented: (1) whether Ramos was compelled to incriminate himself during the polygraph examination in violation of his rights under the Fifth Amendment, and (2) whether the government presented sufficient evidence at trial to support Ramos's convictions for knowing receipt and possession of child pornography.

---

possession of child pornography, in connection with the computer seized on April 4, 2008, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2256(8)(A); and Count 4 (redesignated Count 3 at trial), which charged possession of child pornography, in connection with the laptop computer seized on November 21, 2008, in violation of 18 U.S.C. §§ 2252A(a)(5)(B), 2256(8)(A), and 2256(8)(C).

## I.   *The Right Against Self-Incrimination*

### A.   *Applicable Law*

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  The privilege permits a person to refuse to answer questions, in formal or informal proceedings, where the answers might be used to incriminate him in future criminal proceedings.  *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984); *accord United States v. Jennings*, 652 F.3d 290, 303 (2d Cir. 2011).  In the supervision context, we have held that a condition requiring polygraph tests for defendants convicted of sex crimes does not violate the right against self-incrimination as long as the supervisee retains the right to challenge in a court of law the use of incriminating statements as violations of his Fifth Amendment rights.  *See United States v. Johnson*, 446 F.3d 272, 278-80 (2d Cir. 2006) (citing *Asherman v. Meachum*, 957 F.2d 978 (2d Cir. 1992) (en banc)).

As a general matter, the Fifth Amendment privilege is not self-executing.  *Murphy*, 465 U.S. at 425; *Jennings*,

652 F.3d at 303-04.  Rather, the privilege must be invoked: an individual must claim the privilege to be protected by it.  An individual who makes self-incriminating statements without claiming the privilege is deemed not to have been "compelled" but to have spoken voluntarily.  *See Murphy*, 465 U.S. at 429; *Jennings*, 652 F.3d at 303-04.

One exception exists for the "so-called 'penalty' cases," where the government compels an individual "to forgo the Fifth Amendment privilege by threatening to impose economic or other sanctions 'capable of forcing . . . self-incrimination.'"  *Murphy*, 465 U.S. at 434 (quoting *Lefkowitz v. Cunningham*, 431 U.S. 801, 806 (1977)).  Where the government compels an individual to speak by threatening him with a substantial penalty for exercising his Fifth Amendment right to remain silent, the privilege is self-executing.  *Id.* at 434-35.

In the supervision context, if a probation or parole officer tells a supervisee, explicitly or implicitly, that invocation of the privilege would lead to revocation of supervision, the supervisee is deemed to have been compelled

to speak and his failure to assert the privilege would be excused.  *Id.* at 435 (describing this scenario as "the classic penalty situation").  The penalty exception does not apply, however, merely because the terms of probation require a probationer to appear before his probation officer and tell the truth "in all matters."  *Id*. at 433-39.  Rather, a supervisee is deemed to have been compelled to speak only where he is required by the government "to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent."  *Id.* at 436.  In determining whether a person's incriminating statements were compelled in such a "penalty case," we examine the totality of the circumstances.  *See United States v. Roberts*, 660 F.3d 149, 156 (2d Cir. 2011), *cert. denied*, 132 S. Ct. 1640 (2012).

In *Murphy*, the probationer was required by his terms of probation to be truthful with his probation officer "in all matters."  *Id.* at 422.  He was informed that failure to comply with his conditions of probation "could result in his return to the sentencing court for a probation

- 14 -

revocation hearing." *Id*. Indeed, Murphy understood that "revocation of his probation was threatened if he was untruthful with his probation officer." *Id*. at 434.

Nonetheless, the Court held that the probationer was not compelled to incriminate himself when he admitted to his probation officer that he had committed a rape and murder. *Id*. at 424, 439. The Court noted that the probationer had not been told that his "assertion of the privilege *would* result in the imposition of a penalty." *Id*. at 438 (emphasis added). The Court held further that even if the probationer did believe that his probation might be revoked if he claimed the privilege, "that belief would not have been reasonable" because the state could not "constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege." *Id*. *But see Garrity v. New Jersey*, 385 U.S. 493, 496-98 (1967) (holding that statements were compelled where defendants were expressly informed that a refusal to answer questions about possible criminal conduct would result in loss of their jobs). In other words, "[s]o long as [a]

- 15 -

probationer has not been told that he would lose his freedom if he invoked his Fifth Amendment privilege," his answers to his probation officer's questions are not deemed compelled. *Jennings*, 652 F.3d at 304.

On appeal from the district court's denial of a motion to suppress, we review its conclusions of law *de novo* and its factual findings for clear error, viewing the evidence in the light most favorable to the government. *United States v. Garcia*, 339 F.3d 116, 118-19 (2d Cir. 2003).

**B.   *Application***

Here, Ramos's participation in the required polygraph examination is not itself the basis for the claimed constitutional violation.  Rather, the question presented is whether the incriminating statements Ramos made during the course of that examination were admissible under the Fifth Amendment.  As Ramos did not invoke his Fifth Amendment right against self-incrimination when he was

- 16 -

interviewed for the polygraph examination on April 4, 2008,[4]

that question thus turns on whether his incriminatory

statements were compelled as contemplated by *Murphy*.  We

conclude they were not.

First, Ramos was not "told that he *would* lose his

freedom if he invoked his Fifth Amendment privilege."

*Jennings*, 652 F.3d at 304 (emphasis added); *see Murphy*, 465

U.S. at 435 ("[I]f the state, either expressly or by

implication, asserts that invocation of the privilege *would*

lead to revocation of probation, it would [create] the

classic penalty situation . . . .") (emphasis added)).

Rather, the consent forms he signed warned him only that his

failure to fully and truthfully answer all questions put to

---

[4]    Although Ramos protested on March 5, 2008, that the
imposition of the two new conditions of parole "violated his
rights," that statement was not sufficient to invoke the
privilege.  Even liberally construed, in "'the entire context in
which the claimant spoke,'" the passing remark was too vague and
too far removed in time to be considered an invocation of his
Fifth Amendment rights for his interview on April 4, 2008.
*Bradley v. Meachum*, 918 F.2d 338, 342 (2d Cir. 1990) (quoting
*United States v. Goodwin*, 470 F.2d 893, 902 (5th Cir. 1972)).  At
the very least, we cannot say that, when the evidence is taken in
the light most favorable to the government, the district court
clearly erred in not finding that Ramos asserted his Fifth
Amendment rights by objecting on March 5, 2008.  *See Garcia*, 339
F.3d at 118-19.

him by his parole officer *could* lead to the initiation of violation proceedings or the revocation of his parole.[5] This was precisely the situation faced by the probationer in *Murphy*, who was told that his failure to be truthful in all matters "*could* result in revocation of probation."  465 U.S. at 436 (emphasis added).  Yet, the Court held that the probationer in *Murphy* was not compelled to speak.  *Id.* at 436-39.

Second, there is no evidence that Ramos subjectively felt compelled to answer incriminating questions during the polygraph examination or the ICE agents' later investigation.  *See id.* at 437-38 (concluding there was no Fifth Amendment violation because, among other factors, there was no direct evidence of subjective

---

[5]     *See* Appellant's App. at 35 (Consent for Polygraph Examination: "failure to answer questions regarding my conformance to parole . . . conditions, in the discretion of the Parole Office and Polygraph Examiner, may be deemed as a failure to participate in a meaningful way and be submitted . . . as a parole . . . violation"); Appellee's App. at 137 (Notice of Polygraph Examination Requirements and Procedures: "Failure to fully cooperate and participate in any aspect of the polygraph examination session, including refusal to answer questions during the examination, may be grounds for violations of my parole." (emphasis omitted)).

compulsion).  During the suppression hearing, Ramos was questioned about forms he signed granting the ICE agents consent to search his home on April 4, 2008, and testified: "If I did not sign those documents, there was no doubt in my mind that I would go to prison.  I would be violated on parole and be sent back to prison."  Ramos, however, offered no such testimony regarding his consent to the polygraph examination or to answering the ICE agents' questions.  Rather, the record shows that Ramos eventually agreed to participate in the polygraph examination without expressing any reservations, and that he was capable of declining the ICE agents' requests for information as illustrated by his refusal to provide a written statement.  Thus, the record does not support a finding of subjective compulsion.

Third, Ramos could not have reasonably believed that his parole would be revoked for exercising his Fifth Amendment rights.  As explained in the Supreme Court's decision in *Murphy*, the State of New York could not have constitutionally carried out a threat to revoke Ramos's parole because he invoked his Fifth Amendment right to

remain silent.  *See id.* at 438.  Indeed, the New York courts have held that "the State may not punish a parolee for invoking his Fifth Amendment privilege by revoking his parole."  *People v. Dyla*, 536 N.Y.S.2d 799, 811-12 (App. Div. 2d Dep't 1988) (citing *Murphy*, 465 U.S. at 438-40).

We conclude, therefore, that the circumstances of Ramos's polygraph examination on April 4, 2008, did not create a penalty situation such that his Fifth Amendment privilege against self-incrimination became self-executing. The district court did not err in denying Ramos's motion to suppress his incriminating statements and the physical evidence obtained thereafter.[6]

---

[6]    Ramos also argues on appeal that the searches of his home and seizure of the computers on both April 4, 2008, and November 21, 2008, violated his rights under the Fourth Amendment.  We reject the arguments.

First, the district court did not clearly err in finding that Ramos voluntarily consented to the April 4, 2008, search and seizure.  *See United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006).  Although Ramos testified that he felt compelled to sign the consent forms, he also stated that he was capable of refusing the ICE agents' requests for information. Further, Ramos's claim of compulsion is contradicted by the ICE agents' testimony that Ramos was cooperative during the April 4, 2008, home visit.  *See Ceraso v. Motiva Enters., LLC*, 326 F.3d 303, 316 (2d Cir. 2003) ("In reviewing findings for clear error, we are not allowed to second-guess either the trial court's credibility assessments or its choice between permissible

## II. *Sufficiency of Evidence*

In considering a defendant's challenge to the sufficiency of the evidence, we "view the evidence presented in the light most favorable to the government, and . . . draw all reasonable inferences in its favor, affirming the jury verdict unless no rational trier of fact could have found all of the elements of the crime beyond a reasonable doubt." *United States v. Desinor*, 525 F.3d 193, 203 (2d Cir. 2008) (citation and internal quotation marks omitted) (omission in original); *accord United States v. Adekanbi*, 675 F.3d 178, 182 n.3 (2d Cir. 2012). A jury's verdict must be upheld if "*any* rational trier of fact could have found

competing inferences.").

Second, the parole officers' warrantless search of Ramos's home on November 21, 2008, was consistent with the Fourth Amendment because it was "rationally and reasonably related to the performance of the parole officer[s'] duty." *United States v. Grimes*, 225 F.3d 254, 258-29 & n.4 (2d Cir. 2000) (citation and internal quotation marks omitted); *accord United States v. Barner*, 666 F.3d 79, 84-85 (2d Cir. 2012). Specifically, the officers searched Ramos's trailer in accordance with the conditions of Ramos's parole, which permitted them to search and inspect his home without any suspicion. *See United States v. Reyes*, 283 F.3d 446, 462 (2d Cir. 2002). Further, the parole officers' search of Ramos's bedroom was justified by the need to investigate whether Ramos had committed any new parole violations. *See Barner*, 666 F.3d at 85.

the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Two sufficiency issues are presented: first, whether viewing images in temporary internet files constitutes receipt or possession of child pornography, and, second, whether using computer equipment manufactured abroad to create "morphed" images of child pornography meets the interstate or foreign commerce element of the crimes of conviction.

A.   *Temporary Internet Files*

Ramos argues, with respect to the computer seized on April 4, 2008, that the evidence failed to prove that he knowingly received or possessed images from the internet because the evidence showed only that he viewed images in temporary internet or "cache" files (without saving them) and that the mere viewing of child pornography stored in temporary internet files was insufficient to sustain a conviction under the statute as it then existed.

Ramos was charged with receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2)(A) and possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B).  At the time Ramos committed the acts in question, the statute provided in pertinent part:

(a)  Any person who --

(2) knowingly receives . . . (A) any child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer, . . .

[or]

(5) . . . (B) knowingly possesses any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce, including by computer, . . .

[commits a crime].

- 23 -

18 U.S.C. § 2252A(a)(2)(A), (5)(B) (effective July 27, 2006 to October 7, 2008).[7]

The statute does not define receipt or possession, and courts have given these terms their plain meaning. *See, e.g., United States v. Pruitt*, 638 F.3d 763, 766 (11th Cir. 2011) (per curiam) ("The ordinary meaning of 'receive' is 'to knowingly accept'; 'to take possession or delivery of'; or 'to take in through the mind or senses.'" (quoting *Webster's Third New International Dictionary: Unabridged* 1894 (1993)), *cert. denied*, 132 S. Ct. 113 (2011)); *United States v. Romm*, 455 F.3d 990, 998-1000 (9th Cir. 2006) ("'Possession' is '[t]he fact of having or holding property

---

[7] On October 8, 2008 -- after the seizure of Ramos's desktop computer on April 4, 2008, but before the seizure of Ramos's laptop on November 21, 2008 -- Congress amended § 2252A(a)(5)(B) to add the words "or knowingly accesses with intent to view," to make clear that accessing child pornography to view it was proscribed. *See* Enhancing the Effective Child Pornography Prosecution Act of 2007, Pub. L. No. 110-358, § 203(b), 122 Stat. 4001, 4003 (2008). A Senate report explained that the amendment "fills a gap in existing law that has led some courts to overturn convictions of possessors of child pornography. It amends the child pornography possession offense to clarify that it also covers knowingly accessing child pornography on the Internet with intent to view child pornography." S. Rep. No. 110-332, at 5 (2008), *available at* 2008 WL 1885750 (2008).

in one's power; the exercise of dominion over property.'"
(quoting *Black's Law Dictionary* 1183 (7th ed. 1999))
(alteration in original)); *United States v. Tucker*, 305 F.3d
1193, 1204 (10th Cir. 2002) ("Possession is defined as 'the
holding or having something (material or immaterial) as
one's own, or in one's control.'" (quoting *Oxford English
Dictionary* (2d ed. 1989))).

This Court has not yet decided whether viewing
images stored in temporary internet files is sufficient to
establish knowing receipt or possession of child
pornography. *See United States v. Falso,* 544 F.3d 110, 121
n.13 (2d Cir. 2008); *United States v. Martin*, 426 F.3d 68,
77 (2d Cir. 2005) (whether "viewing" child pornography on
internet is legal is "an open question"). Other Circuits,
however, have upheld child pornography receipt and
possession convictions where a defendant viewed child
pornography stored in temporary internet files on a
computer. *See, e.g., Pruitt*, 638 F.3d at 766-67 ("A person
'knowingly receives' child pornography under 18 U.S.C. §

2252A(a)(2) when he intentionally views, acquires, or accepts child pornography on a computer from an outside source," whether or not he "acts to save the images to a hard drive, to edit them, or otherwise to exert more control over them."); *United States v. Kain*, 589 F.3d 945, 948-50 (8th Cir. 2009) ("The presence of child pornography in temporary internet and orphan files on a computer's hard drive is *evidence*[, although not conclusive,] of prior possession of that pornography . . . ."); *Romm*, 455 F.3d at 998, 1002 (concluding that knowingly taking possession of files in internet cache, by accessing and manipulating them, constituted knowing receipt of those files); *United States v. Bass*, 411 F.3d 1198, 1201-02 (10th Cir. 2005) (affirming conviction for knowing possession where child pornography files viewed on internet were automatically saved to hard drive). *But see United States v. Flyer*, 633 F.3d 911, 918-20 (9th Cir. 2011) (vacating conviction for possession under § 2252(a)(4)(B) and (b)(2) where images were located in "unallocated space" for deleted data on defendant's

computer's hard drive and government presented no evidence that defendant could or did access files).

In the circumstances here, we hold that the evidence was sufficient to prove that Ramos was guilty of knowingly receiving and possessing child pornography under the statute as it was worded in April 2008, even assuming he viewed the images in question only in temporary internet files and did not save them onto his hard drive.

First, giving the words their plain meaning, Ramos clearly "receive[d]" and "possesse[d]" the images, even though they were only in his temporary internet files. As the evidence showed below, Ramos had some control over the images even without saving them -- he could view them on his screen, he could leave them on his screen for as long as he kept his computer on, he could copy and attach them to an email and send them to someone, he could print them, and he could (with the right software) move the images from a cached file to other files and then view or manipulate them off-line. *See Romm*, 455 F.3d at 998 (relying on witness's

testimony as to what could be done with cached files); *Tucker*, 305 F.3d at 1204-05 (relying on witness's testimony as to what could be done with cached files). Hence, as the evidence showed below, an individual who views images on the internet accepts them onto his computer, and he can still exercise dominion and control over them, even though they are in cache files. In other words, he receives and possesses them.

Second, here there was ample evidence that Ramos intentionally searched for images of child pornography, found them, and knowingly accepted them onto his computer, albeit temporarily. The browsing history on his desktop computer showed that Ramos intentionally searched for child pornography on the internet. *See, e.g.*, *Pruitt*, 638 F.3d at 767 (upholding defendant's conviction where "investigators found a record of internet searches using terms related to child pornography . . . and a record of visits to websites with a child-pornography connection"); *Kain*, 589 F.3d at 949-50 (finding sufficient evidence for knowing possession

where defendant's browsing history showed repeated accessing of child pornography websites). In fact, he viewed some 140 images of child pornography, which were stored on the computer in temporary internet files. He knew that these images would be found on his computer, as he told the ICE agents that they would probably find child pornography there. Further, he had also attempted to delete the temporary internet files and browsing history from his computer. *See Bass*, 411 F.3d at 1202 ("[T]he jury here reasonably could have inferred that Bass knew child pornography was automatically saved to his mother's computer based on evidence that Bass attempted to remove the images.").

Accordingly, we conclude that there was sufficient evidence from which a rational trier of fact could have found that Ramos knowingly received and possessed child pornography on the computer seized on April 4, 2008.

**B.** *Interstate or Foreign Commerce*

The laptop seized on November 21, 2008, contained "morphed images" -- images digitally altered to depict children apparently engaging in sexual activity. Ramos argues that the government failed to establish that the original or "source" images came through the internet or otherwise traveled in interstate and foreign commerce. He further argues that the government failed to show that the images were produced using materials that had traveled in interstate or foreign commerce. *See* 18 U.S.C. § 2252A(a)(5)(B). Hence, he contends, there was insufficient evidence of a nexus to interstate or foreign commerce.

This Court has rejected the argument that a similar statute, 18 U.S.C. § 2251, is unconstitutional when applied to child pornography that has not crossed state lines. *United States v. Holston*, 343 F.3d 83, 90 (2d Cir. 2003). For our purposes here, there is no meaningful distinction between § 2251 and § 2252A.[8] We held in *Holston*

---

[8]     Section 2251(a) criminalizes sexual exploitation of children and, employing language virtually identical to the

that even child pornography created entirely intrastate had

a significant impact on interstate commerce because the

producer of the pornography supplied the interstate market,

and we rejected a Commerce Clause challenge to the federal

child pornography laws.  *See id.* at 88-91; *accord United*

*States v. Harris*, 358 F.3d 221, 222 (2d Cir. 2004).  Hence,

we consider here the specific question of whether the

interstate commerce nexus is established by a defendant's

use of a foreign-manufactured computer to produce child

pornography.

This Court has not considered the issue in a

published decision.[9]  Other Circuits, however, have held

that a defendant's use of non-American-made computers or

digital equipment to produce child pornography satisfies the

---

language of § 2252A, bars producing a "visual depiction" of
sexually explicit conduct involving a minor using materials
shipped or transported in interstate or foreign commerce.  18
U.S.C. § 2251(a).

[9]    *But see United States v. Porter*, 184 F. App'x 112, 114
(2d Cir. 2006) (summary order) (holding, in rejecting challenge
to sufficiency of evidence as to interstate commerce nexus,
"government may satisfy this element by showing that the computer
that produced the images has traveled in interstate commerce").

interstate or foreign commerce element.  *See United States v. Schene*, 543 F.3d 627, 639 (10th Cir. 2008) (finding sufficient evidence of interstate or foreign nexus under § 2252A(a)(5)(B) where government's evidence showed "each 'image of child pornography' had been copied or downloaded to Schene's [Singapore-manufactured] hard drive in one capacity or another"); *United States v. Mugan*, 441 F.3d 622, 628-30 (8th Cir. 2006) (holding interstate commerce element of § 2252A fulfilled where child pornography stored on digital memory card transported in interstate and foreign commerce); *United States v. Anderson*, 280 F.3d 1121, 1123-25 (7th Cir. 2002) (holding jurisdictional prong was met where government proved defendant downloaded or copied images of child pornography onto hard drive manufactured in Malaysia and refurbished in Singapore); *United States v. Guagliardo*, 278 F.3d 868, 871 (9th Cir. 2002) (holding jurisdictional prong was met where government proved defendant copied images onto computer disks manufactured abroad).  We agree with these decisions, and hold that the act of using

computer equipment manufactured outside the United States to produce child pornography meets the jurisdictional requirement of § 2252A(a)(5)(B).[10]

The morphed images at issue here were found on Ramos's laptop, which was manufactured in Korea.  Its hard drive was manufactured in Thailand.  Both pieces of equipment were thus materials that had been "shipped or transported in interstate or foreign commerce" under § 2252A(a)(5)(B).  The government also offered into evidence two "innocent" images found on the laptop that were the sources for the morphed pornography as well as evidence that Ramos's laptop contained Microsoft Picture It, an image editing program that the jury could infer Ramos used to

---

[10]    Some courts have held that the mere copying or downloading of an image is "production" for purposes of the federal child pornography statutes. *See, e.g.*, *United States v. Dickson*, 632 F.3d 186, 189 (5th Cir. 2011); *Schene*, 543 F.3d at 638-39; *United States v. Maxwell*, 386 F.3d 1042, 1052 (11th Cir. 2004), *vacated on other grounds*, 546 U.S. 801 (2005); *Anderson*, 280 F.3d at 1125 ("Computerized images are produced when computer equipment is used to copy or download the images." (citing *United States v. Angle*, 234 F.3d 326, 341 (7th Cir. 2000))); *Guagliardo*, 278 F.3d at 871.  We need not decide the issue, as Ramos did far more than simply copy or download images here: the evidence showed that he altered innocent images and created "morphed" images, thereby producing child pornography.

create the morphed images.  A reasonable juror easily could have concluded that Ramos knowingly possessed "an image of child pornography . . . that [he] produced using materials . . . shipped or transported in interstate or foreign commerce," namely, a computer manufactured in Korea and a hard drive manufactured in Thailand.  18 U.S.C. § 2252A(a)(5)(B).

Finally, Ramos argues that the statute is unconstitutional as applied to him because the evidence could only show that he created the images "alone in his trailer," engaging in "private conduct on his laptop," using images that could only have been his "personal family photos" that never traveled across the internet, without any evidence suggesting he intended to distribute the morphed images to anyone else.  This argument fails.  As we explained in *Holston*, "Congress understood that much of the pornographic material involving minors that feeds the [national] market is locally produced, and this local or 'homegrown' production supports demand in the national

market and is essential to its existence." *Holston*, 343 F.3d at 90. "[W]hen Congress regulates a class of activities that substantially affect interstate commerce," the fact that particular activities within that class do not have a substantial effect on interstate commerce is "'irrelevant.'" *Id.* at 90 (quoting *Proyect v. United States*, 101 F.3d 11, 14 (2d Cir. 1996) (*per curiam*)). "The government need not demonstrate a nexus to interstate commerce in every prosecution." *Holston*, 343 F.3d at 91. As § 2252A clearly lies within Congress's powers under the Commerce Clause, the fact that Ramos "neither shipped [his images] interstate nor intended to benefit commercially from [them] is of no moment." *Id.*

We conclude that the jury's verdict convicting Ramos of possession of child pornography under § 2252A(a)(5)(B) was sufficiently supported by the evidence.

### CONCLUSION

We have considered Ramos's remaining arguments and conclude that they are without merit.[11]  For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

[11]     Our decision in *United States v. Hotaling* precludes Ramos's argument that the application of 18 U.S.C. §§ 2252A and 2256 to morphed pornography violates the First Amendment.  *United States v. Hotaling*, 634 F.3d 725, 728-30 (2d Cir. 2011) (holding that child pornography created by digitally altering images of real children is not protected expressive speech under the First Amendment), *cert. denied*, 132 S. Ct. 843 (2011); *see United States v. Stevens*, 130 S. Ct. 1577, 1586 (2010) (noting that child pornography is a category of speech "fully outside the protection of the First Amendment" (citing *New York v. Ferber*, 458 U.S. 747, 763 (1982))); *United States v. Bach*, 400 F.3d 622, 632 (8th Cir. 2005) (holding that creation of a "lasting record" of an "identifiable minor child, seemingly engaged in sexually explicit activity," would victimize child and thus was properly considered child pornography).  Likewise, we reject Ramos's Eighth Amendment challenge to his sentence.  The district court acted well within its discretion in imposing the statutory mandatory minimum of 180 months' imprisonment, a sentence that was well below the Guidelines range of 324-405 months, and that was reasonable under all the circumstances.  *See United States v. Rivera*, 546 F.3d 245, 254-55 (2d Cir. 2008); *United States v. MacEwan*, 445 F.3d 237, 248-50 (3d Cir. 2006); *see also United States v. Yousef*, 327 F.3d 56, 163 (2d Cir. 2003) ("[L]engthy prison sentences . . . do not violate the Eighth Amendment's prohibition against cruel and unusual punishment when based on proper application of the Sentencing Guidelines or statutorily mandated . . . terms.").